WOODRUFF, SPRADLIN & SMART, APC
DANIEL K. SPRADLIN – State Bar No. 82950
dspradlin@wss-law.com
JEANNE L. TOLLISON – State Bar No. 238970
jtollison@wss-law.com
555 Anton Boulevard, Suite 1200
Costa Mesa, California 92626-7670
Telephone: (714) 558-7000
Facsimile: (714) 835-7787

Attorneys for Defendants COUNTY OF ORANGE and MICHAEL HIGGINS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY J. ZION, individually and as successor in interest to CONNOR ZION,<br><br>    Plaintiff,<br><br>v.<br><br>COUNTY OF ORANGE, MICHAEL HIGGINS and DOES 1 through 10, inclusive,<br><br>    Defendants. | CASE NO: SACV14-01134 JVS (JDEx)<br><br>BEFORE THE HONORABLE JAMES V. SELNA<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND NON-TAXABLE COSTS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ROBERT L. KAUFMAN AND JEANNE L. TOLLISON**<br><br><u>HEARING DATES PENDING</u>:<br>Type:    Plaintiff's Motion for Attorneys' Fees and Non-Taxable Costs<br>Date:    March 25, 2019<br>Time:    1:30 p.m.<br>Ctrm:    10C |

Defendants COUNTY OF ORANGE and MICHAEL HIGGINS submit the following points and authorities, declarations of Robert L. Kaufman and Jeanne L. Tollison, and Exhibits in opposition to Plaintiff's motion for attorney's fees and non-taxable costs.

///

///

///

i

1

# **TABLE OF CONTENTS**

2

Page

3

1.   INTRODUCTION ................................................................. 1

4

2.   STATEMENT OF FACTS ....................................................... 2

5

    A.   Procedural Facts ..................................................... 2

    B.   Summary of Claims and Prevailing Party ........................ 5

6

    C.   Defense and Discovery Issues ..................................... 7

7

3.   THE HADSELL STORMER & RENICK FEES OF APPROXIMATELY $1.2 MILLION ARE NOT JUSTIFIED ................................. 9

8

    A.   Under Relevant Case Law, Because Plaintiff's Success was Minimal this Court Must Adjust the Fee Request Downwards ........... 9

9

10

    B.   Defendant Should Not Be Substituted as the Victim of Plaintiff's First Counsel's Alleged Malpractice ................ 17

11

    C.   The Hours are not Reasonable ................................... 17

    D.   The Rates are not Reasonable ................................... 18

12

    E.   The Number of Plaintiff's Attorneys was Excessive .......... 19

13

    F.   Block Billing is Impermissible and Requires a Reduction ... 20

4.   STEERING'S FEES SHOULD BE REDUCED .......................... 20

14

5.   DUNN'S FEES SHOULD BE DENIED IN THEIR ENTIRETY ....... 20

15

6.   MOST OF PLAINTIFF'S NON-STATUTORY COSTS SHOULD BE DENIED OR, AT THE VERY LEAST, REDUCED ................... 21

16

    A.   Word Processing is Overhead, No Detail is Provided, and is Not Recoverable ................................... 21

17

    B.   The Request for Various Office Supplies Should not be Recovered .. 22

18

    C.   No Detail is Provided for Photocopying and it Should be Denied or Substantially Reduced ............................... 22

19

    D.   Parking and Mileage Should be Limited to Items with Documentation ................................... 23

20

    E.   All Non-Statutory Costs Should be Reduced to Reflect the Limited Success of Plaintiff ................................... 24

21

7.   CONCLUSION ................................................................. 24

22

DECLARATION OF ROBERT L. KAUFMAN ............................... 26

23

DECLARATION OF JEANNE L. TOLLISON ............................... 53

24

25

26

27

28

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

# **TABLE OF AUTHORITIES**

Page

**FEDERAL CASES**

*Aguilar v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) ...........................................39

*Blum v. Stenson*, 465 U.S. 886 (1984) ......................................................................18

*Bryant v. City of Chicago*, 200 F.3d 1092 (7th Cir. 2000) ..........................................24

*Carson v. Billings Police Department*, 470 F.3d 889 (9th Cir. 2006)...................34, 39

*Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243 (10th Cir. 1998) ..........................24

*City of Riverside v. Rivera*, 477 U.S. 561 (1986) ...............................................11, 12

*Coles v. City of Oakland*, 2007 WL 39304 (January 4, 2007) ....................................33

*Cummings v. Connell*, 316 F.3d 886 (9th Cir. 2003) ..................................................24

*Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005).........................................................9, 10

*Democratic Party of Washington State v. Reed*, 388 F.3d 1281 (9th Cir. 2004) .........19

*Guckenberger v. Boston Univ.*, 8 F.Supp.2d 91 (D. Mass 1998) ................................21

*Harris v. Marhoefer*, 24 F.3d 16 (9th Cir. 1994)......................................................21

*Harvey v. Mohammed*, 951 F.Supp.2d 47 (D.D.C. 2013) .....................................21, 23

*Hensley v. Eckhart*, 461 U.S. 424 (1983) ..........................................................passim

*Laffey v. Northwest Airlines*, 572 F.Supp. 354 (DDC 1983)................................39, 43

*Lehr v. City of Sacramento*, Case No. 2:07-CV-01565 MCE (GGH)

   (E.D. Cal. March 22, 2013)...........................................................................44, 45

*Lightbourne v. Printroom, Inc.*, 2015 WL 12732457, 9 (C.D. Cal. 2015)..................20

*Lopez v. San Francisco Unified School Dist.*, 385 F.Supp.2d 981 (N.D. Cal. 2005) .21

*McCown v. City of Fontana*, 565 F.3d 1097 (9th Cir. 2009)................10, 11, 12, 13

*McGinnis v. Kentucky Fried Chicken*, 51 F.3d 805 (9th Cir. 1994) ......................11

*Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2009)........................39

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)...........................................passim

*Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir. 1996) ...................................12

*Newman v. City of Payette*, 2016 WL 1611430 (D. Idaho 2016)................................21

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1

### <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3    *Rickley v. Cty. of Los Angeles*, No. CV 08-4918 SVW (AGR),

4       2011 WL 13201909, at *4, n.5 (C.D. Cal. Dec. 14, 2011) ...........................13, 16

5    *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988)............43

6    *Schwarz v. Sec'y of Health & Human Serv.* 73 F.3d 895 (9th Cir. 1995)...................10

7    *Theme Promotions, Inc. v. News America Marketing FSI, Inc.*,

8       731 F.Supp.2d 937 (N.D. Cal. 2010) ........................................................40

9    *Treveno v. Gates*, 99 F.3d 911 (9th Cir. 1996)..........................................33

10   *Watson v. County of Riverside*, 300 F.3d 1092 (9th Cir. 2002)...................10

11   *Webb v. Sloan*, 330 F.3d 1158 (9th Cir. 2003) ..........................................10

12   *Wilcox v. City of Reno*, 42 F.3d 550 (9th Cir. 1994) ................................12

13   *Young v. Wolfe*, No. CV0703190RSWLAJWX, 2017 WL 3184167,

14      at *8 (C.D. Cal. July 26, 2017) ................................................10, 13

15   *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017) ...........................4

16   **STATE CASES**

17   *Bihun v. AT&T Information Systems, Inc.*, 13 Cal. App. 4th 976 (1993)...................31

18   *Christian Research Institute v. Almor*, 165 Cal. App. 4th 1315 (2016)......................20

19   *Lakin v. Watkins Associated Industries*, 6 Cal. 4th 644 (1993)...................31

20   *Mountjoy v. Bank of America*, 245 Cal. App. 4th 266 (2016)...............................44, 45

21   *Nemecek & Cole v. Horn*, 208 Cal. App. 4th 641 (2012)............................................43

22   *PLCM Group, Inc. v. Drexler*, 22 Cal. 4th 1084 (2000) ................................31

23   *Syers Properties III, Inc. v. Rankin*, 226 Cal. App. 4th 691 (2014) ...........................43

24   *Welch v. Metropolitan Life Insurance Company*,

25      480 F.3d 942 (9th Cir. 2007)........................................................20, 31, 46

26   **FEDERAL STATUTES**

27   42 U.S.C. section 1983 ..........................................................................3

28   ///

WOODRUFF, SPRADLIN<br>& SMART<br>ATTORNEYS AT LAW<br>COSTA MESA

iv

# **TABLE OF AUTHORITIES**

Page

## **STATE STATUTES**

Business & Professions Code section 6148(b) ....................................................46

Civil Code section 52.1 .............................................................................3, 7, 15

Code of Civil Procedure section 377.30 ...............................................................3, 4

Code of Civil Procedure section 377.60 ...............................................................3, 4

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

v

1390614.1

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.   INTRODUCTION

To justify an award of exorbitant attorney's fees, Plaintiff recasts what this case was about and what the jury determined, painting a grossly inflated and misleading picture of her success. In fact, the jury's verdict was strictly circumscribed and Plaintiff's success extremely limited.

Plaintiff sought over $25 million in compensatory and punitive damages based on the core theory that Higgins's use of unreasonable force caused Connor Zion's death. This case always was about seeking damages for Zion's death and compensating Plaintiff for the loss of her son, not his pain and suffering. The vast majority of time spent litigating this case by Plaintiff's attorneys, Hadsell, Stormer, and Reznick, was developing facts for their theory on cause of death. The case went to trial on the claim that a constitutional violation caused Zion's death:

"At the end of the trial, we're going to ask you to hold the defendant, Michael Higgins, responsible for killing Connor Zion and for a verdict on behalf of the plaintiff against the deputy who killed Connor." (Pánuco opening statement, Reporter's Transcript 1/9/19, 35:1-5, Ex. C.)

"We can't bring Connor Zion back, but you will be able to compensate the loss of Ms. Zion with a verdict in her favor." (*Id.* at 35:18-20, Ex. C.)

***But, Plaintiff lost this claim.*** Specifically, the jury found that Higgins's conduct did not cause Zion's death. (Plaintiff's Judgment After Jury Trial, Dkt. 303, 3:4-6.)

Indeed, it was Defendants who overwhelmingly prevailed in this litigation:

- Plaintiff Kimberly Zion, as an individual, prevailed on no claims.
- Plaintiff Kimberly Zion, as successor in interest, prevailed on one claim for excessive force, with the jury awarding $360,000 for Connor Zion's pain and suffering.
- Defendants prevailed on the jury finding that excessive force did not lead

1390614.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

to Zion's death; conversely, the force that was used that did cause Zion's death was reasonable.

- Defendants prevailed on the jury finding that Defendant Higgins did not act with malice, oppression, or engage in despicable connect.

- Defendants prevailed on punitive damages.

- Defendants prevailed on summary judgment, affirmed on appeal, on Plaintiff's claims for *Monell* violations.

- Defendants prevailed on summary judgment, affirmed on appeal, on portions of the Plaintiff's excessive force claims.

- Defendants prevailed on Plaintiff's remaining Federal claims for constitutional violations under the Fourth and Fourteenth Amendments.

- Defendants prevailed on Plaintiff's state civil rights claim under the Bane Act.

- Defendants prevailed on Plaintiff's state law personal injury claims for wrongful death (negligence), battery, and intentional infliction of emotional distress.

Plaintiff's request for attorney's fees of $1.3 million dollars -- almost $1.2 million of which was incurred in only six months' time by Plaintiff's counsel, Hadsell, Stormer & Renick -- is not justified by the very limited success achieved by Plaintiff. Even if the exorbitant fee claim were commensurate with success, Plaintiff has not properly justified the number of hours billed and the billing rates, as set out in detail in the declaration of Defendants' expert, Robert Kaufman. For these reasons, as more particularly set out in Mr. Kaufman's declaration, Defendants request a substantial reduction in the amount of attorney's fees to be awarded.

## 2.    STATEMENT OF FACTS

### A.    Procedural Facts

Plaintiff's initial complaint was filed on July 18, 2014, and alleged eleven causes of action. Plaintiff's first amended complaint, correcting certain allegations,

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

was filed on August 1, 2014 and also alleged eleven causes of action. Specifically, the first amended complaint labeled Plaintiff's claims as follows:

(1)    "Use of Unreasonable Force on Person Under Fourth Amendment [42 U.S.C. § 1983] (Federal Survivalship Claim Via Cal. Civ. Proc. Code § 377.30) (Against all defendants);"

(2)    "Unreasonable Seizure of Person Under Fourth Amendment [42 U.S.C. § 1983] (Federal Survivalship Claim Via Cal. Civ. Proc. Code § 377.30) (Against all defendants);"

(3)    "Loss of Parent-Child Relationship Without Due Process of Law Under Fourth and Fourteenth Amendment [42 U.S.C. § 1983] (Against all defendants);"

(4)    "Deprivation of Life Without Due Process of Law Under Fourteenth Amendments (sic) (And as otherwise provided for under the U.S. Const. as those other rights retained by the People (U.S. Const. Amend. 9.)) [42 U.S.C. § 1983] (Federal Survivalship Claim Via Cal. Civ. Proc. Code § 377.30) (Against all defendants);"

(5)    "Wrongful Death (Cal. Civ. Proc. Code § 377.60) Under California State Law (Against All Defendants);"

(6)    "Failure To Adequately Train Officers [42 U.S.C. § 1983] (Federal Survivalship Claim Via Cal. Civ. Proc. Code § 377.30, and Direct Liability Claim) (Against County and DOES 8 through 10);"

(7)    "[42 U.S.C. § 1983] Failure To Adequately Screen, Hire And Discipline (Against defendants City and DOES 7 through 10);"

(8)    "Negligence Under California State Law (Against all Defendants);"

(9)    "Intentional Infliction of Emotional Distress Under California State Law [State Survivorship Claim Via Cal. Civil Proc. Code § 377.30] (Against All Defendants);"

(10)    "Violation of Cal. Civ. Code § 52.1 Under California State Law (State Law Survivorship Action -- Cal. Civ. Proc. Code § 377.30 and Direct Liability Claim)

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

3

(Against all Defendants);" and

(11)   "Battery Under California State Law (State Law Survivorship Action – Cal. Civ. Proc. Code § 377.30) (By Plaintiffs Against All Defendants)."

Plaintiff sought an award of compensatory damages in excess of $15,000,000, including treble damages, an award of punitive damages in excess of $10,000,000, and attorney's fees and costs. Plaintiff's second amended complaint, filed December 8, 2014, remained the same but for the elimination of her eighth cause of action for negligence, which the Court deemed duplicative of the wrongful death claim, and also sought the same damages.

On October 7, 2015, this Court granted summary judgment to Defendants on all claims in the second amended complaint. (Dkt. 69.) Judgment was entered in Defendants' favor on October 22, 2015. (Dkt. 71.) Plaintiff subsequently appealed and on November 1, 2017, the Ninth Circuit affirmed this Court's holding that (1) Defendant Higgins's initial nine-round volley was not excessive, and therefore, did not violate Connor Zion's Fourth Amendment rights, (2) neither the initial nine-round volley nor the second nine-round volley violated the Fourteenth Amendment because they "served the legitimate purpose of stopping a dangerous suspect," and (3) "plaintiff's municipal liability claims under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) . . . lack merit." *Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017). The Ninth Circuit reversed all other claims, holding there were triable issues that must be determined by the jury. (*Id.*)

When trial started, there were six claims remaining, including: (1) Excessive force in violation of the Fourth Amendment against Higgins; (2) Deprivation of the Plaintiff's familial rights under the Fourteenth Amendment against Defendant Higgins; (3) Wrongful death under California Code of Civil Procedure §377.60 against Defendants Higgins and County; (4) Intentional infliction of emotional distress against Defendants Higgins and County; (5) Violation of the Bane Act against Defendants Higgins and County; and (6) Battery against Defendants Higgins and

4

County. Then, Plaintiff abandoned the claims for intentional infliction of emotional distress and battery. (Motion, Dkt. 305, 18:15.) The four remaining claims went to the jury, who found for Defendants on three of the claims, including the claims for violation of the 14th Amendment, wrongful death, and the Bane Act. It found for Plaintiff only on the Fourth Amendment claim for excessive force by Higgins. (Judgment, Dkt. 303, 1:17-20.) But even that was not a complete victory, as the jury strictly circumscribed this finding by also finding that Higgins's use of excessive force was not a substantial factor in causing Zion's death and that he did not act with malice:

> "Question 11: Was Michael Higgins's excessive force a substantial factor in causing Connor Zion's death?
>
> Yes ____    No X" (*Id.* at 3:4-5.)
>
> "Question 3: Do you find that Michael Higgins acted with malice or oppression, or engaged in despicable conduct?"
>
> Yes ____    No X" (*Id.* at 2:1-4.)

Plaintiff Kimberly Zion, individually, did not prevail on any of her claims against Defendants, and thus, is not a prevailing party in this action.

Following the liability phase of trial, a damages phase was held. The jury awarded Plaintiff, in her representative capacity only, non-economic damages in the amount of $360,000. (*Id.* at 3:7-9.) This amount is *seventy times less* than the amount requested by Plaintiff in her second amended complaint ("in excess of $25 million"). No punitive damages were awarded.

**B.    Summary of Claims and Prevailing Party**

| Claim | Prevailing Party on Plaintiff's Individual Claim | Prevailing Party on Plaintiff's Representative Claim |
|---|---|---|
| 1.    Excessive Force under Fourth Amendment | **Defendants** | Plaintiff; however, the excessive force was not a |

1390614.1

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

| | | substantial factor in causing Zion's death. Award: $360,000 |
|---|---|---|
| 2.     Unreasonable Seizure under Fourth Amendment | **Defendants** | **Defendants** |
| 3.     Loss of Parent-Child Relationship Without Due Process of Law under Fourteenth Amendment | **Defendants** | N/A |
| 4.     Deprivation of Life Without Due Process of Law Under Fourteenth Amendment | **Defendants** | **Defendants** |
| 5.     Wrongful Death under California State Law | **Defendants** | **Defendants** |
| 6.     Failure to Train Officers | **Defendants**, summary judgment, affirmed on appeal | **Defendants**, summary judgment, affirmed on appeal |
| 7.     Failure to Screen, Hire and Discipline | **Defendants**, summary judgment, affirmed on appeal | **Defendants**, summary judgment, affirmed on appeal |
| 8.     Negligence under California State Law | **Defendants**, Motion to Dismiss | **Defendants**, Motion to Dismiss |
| 9.     Intentional Infliction of Emotional Distress under California State Law | **Defendants**, abandoned at trial | **Defendants**, abandoned at trial |

1390614.1

| 10.    Violation of the Bane Act (Cal. Civ. Code § 52.1) | **Defendants** | **Defendants** |
|---|---|---|
| 11.    Battery under California State Law | **Defendants**, abandoned at trial | **Defendants**, abandoned at trial |
| Punitive Damages | **Defendants** | **Defendants** |

### C.    Defense and Discovery Issues

Plaintiff devotes an extensive section of her motion for attorney's fees attempting to demonize Defendants for mounting a vigorous defense in this matter. Plaintiff seems to think that by demonizing defense counsel this somehow will entitle her to a higher attorney's fees award. But, Defendants have a right to vigorously defend themselves and such vigorous defense does not entitle Plaintiff to a higher fee award. Indeed, because of Defendants' vigorous defense, Defendants prevailed on most of the claims brought against them. At every stage of the litigation, including on pre-trial motions, on appeal, and at trial after remand, Defendants prevailed. There is no doubt that Defendants were tremendously successful in their defense and that fact should reduce, not increase, the amount of fees awarded to Plaintiff.

Plaintiff also devotes an extensive section of her motion to accuse Defendants of obstructing discovery with regard to discovery issues. For example, Plaintiff claims Defendants' "repeated acts of discovery misconduct" required her to file a sanction motion and Defendants' "aggressive litigation tactics" required the Court to hold an evidentiary hearing, leading to increased attorney's fees to pursue evidentiary sanctions against Defendants. (Motion, Dkt. 305, 8:4-5, 8:14-16.) What Plaintiff's fee motion ignores, however, is that after the so-called "aggressive litigation tactics" by defense counsel, this Court essentially found the Defendants did not engage in repeated acts of discovery misconduct, concluding that,

///

7

1390614.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

"THE COURT: I don't believe these circumstances warrant an evidentiary sanction." (Reporter's Transcript, 1/08/19, 182:8-9, Ex. B.)

The Court further stated:

"It seems to me, given the facts here, it would be an *undue sanction* to suggest to the jury the outcome when all the evidence suggests that the outcome is unlikely and better argued than given a presumption. So that portion of the motion for sanction will be denied, with the caveat that the plaintiff will be permitted to go into the Court's order, compliance with the Court order, and attendant results as viewed by Dr. Hiserodt or others." (*Id.* at 183:6-14; emphasis added, Ex. B.)

Thus, there was no finding that Defendants engaged in discovery misconduct, particularly with regard to Zion's brain tissue. Indeed, to the contrary, the Court specifically found that no discovery sanctions were warranted. As Defendants showed to this Court, they acted in good faith to locate the brain, provide Plaintiff's expert with approximately half of the remaining brain tissue to conduct his own microscopic analysis, permit the expert to view all microscopic slides of the brain tissue, and physically inspect all remaining brain tissue in the County's possession. Plaintiff's expert, Dr. John Hiserodt, concluded that the brain showed no trauma and Connor Zion died of gunshot wounds, not the head kicks.

Defendants did not obstruct discovery as Plaintiff claims. And, the evidence Plaintiff's attorneys worked to develop relating to the cause of Zion's death, and for which they now seek recovery of attorney's fees, is one of the many issues upon which Plaintiff did not prevail – that Zion's death was due to excessive force.

In the matter of the alleged discovery abuses, Defendants' so-called "aggressive litigation tactics" were required only because Plaintiff brought an overreaching, meritless motion for sanctions against Defendants. Had defense counsel not been aggressive in opposing Plaintiff's evidentiary sanctions request, Plaintiff would have received an "undue sanction" in her favor. Plaintiff's counsel should not be permitted

1390614.1

to recover fees for bringing such a meritless motion, which required Defendants to file a lengthy opposition and required this Court to hold an evidentiary hearing from which it concluded that the circumstances did not warrant an evidentiary sanction.

## 3.   THE HADSELL STORMER & RENICK FEES OF APPROXIMATELY $1.2 MILLION ARE NOT JUSTIFIED

The question now before this Court is how much recovery has Plaintiff justified. There are three factors to consider. First, to what degree was Plaintiff successful in achieving her objectives? Second, is the amount of time spent on each task appropriate? Third, what is the appropriate billing rate for each attorney or paralegal involved? The mathematical reductions in the fees are set forth in the accompanying declaration of Robert Kaufman and will not be repeated here.

### A.   Under Relevant Case Law, Because Plaintiff's Success was Minimal this Court Must Adjust the Fee Request Downwards

Attorney fee requests must be reduced proportionately with the degree of success or failure. *Hensley v. Eckhart*, 461 U.S. 424, 434 (1983). Specifically, "[a] reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Id.* at 440. Indeed, as was noted in dicta, "had respondents prevailed on only one of their six general claims, [rather than five of the six,] a fee award based on the claimed hours clearly would have been excessive." *Id.* at 436. The Court cautioned that even where it may have been reasonable to bring claims and a case is tried with devotion and skill, "the most critical factor is the degree of success obtained." *Id.*

The Ninth Circuit agrees that fee requests must be justified by the "significance of the overall relief obtained." *Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005). In a case of "partial success," a court must consider "(1) whether 'the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded,' and (2) whether 'the plaintiff achiev[ed] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.'" *Id.* at

1390614.1

812, citing *Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002).

The first step of this analysis requires a court to determine "whether the successful and unsuccessful claims were unrelated." *Dang,* 422 F. 3d at 812, citing *Webb v. Sloan*, 330 F.3d 1158, 1168 (9th Cir. 2003). While the Ninth Circuit has acknowledged that "the test for relatedness of claims is not precise," it has stated that "claims are *unrelated* if the successful and unsuccessful claims are 'distinctly different' *both* legally *and* factually," *Webb,* 330 F. 3d at 1169, quoting *Schwarz v. Sec'y of Health & Human Serv.* 73 F.3d 895, 902-03 (9th Cir. 1995). Thus, for example, the District Court recently held in *Young v. Wolfe*, No. CV0703190RSWLAJWX, 2017 WL 3184167, at *8 (C.D. Cal. July 26, 2017), appeal dismissed, No. 17-56067, 2018 WL 3629904 (9th Cir. Apr. 19, 2018), the supervisory and *Monell* claims were unrelated to the excessive force claim, since they required proof of different elements and sought different damages.

Similarly, here, this Court should find that Plaintiff's excessive force claim is unrelated to the supervisory and *Monell* claims that she brought against the County and upon which Defendants prevailed. As such, this Court should, to the extent possible, separate out the fees incurred in prosecuting those claims against Defendants, which fees should not be awarded to Plaintiff.

But, for those hours of work spent on the litigation as a whole, and on tasks that this Court believes cannot be separated out, the fee award to Plaintiff should be reduced to reflect the fact that the Plaintiff "has achieved only partial or limited success" such that "the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Dang,* 422 F. 3d at 813, quoting *Hensley,* 461 U.S. at 436. This formula of reducing fee awards to reflect the overall success of the prevailing party has been explained and followed by the Ninth Circuit and by this District Court.

In *McCown v. City of Fontana*, 565 F.3d 1097 (9th Cir. 2009), the city argued that the amount of attorney's fees awarded to McCown was

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

10

disproportionate to the amount he received on his one successful claim. Specifically, the city argued that because McCown only prevailed on one of his nine original claims, receiving a fraction of what he originally requested in his settlement demands, his attorney's fees and costs should be reduced to a similar fraction. The district court, in awarding the fees, had indicated that it was unsure whether the fact that eight of McCown's nine claims were dismissed at summary judgment "figures into the calculation" of attorney's fees. The Ninth Circuit concluded that claims dismissed on summary judgment should be taken into account when calculating attorney's fees. *Id.* at 1103.

Relying on *Hensley*, the *McCown* court then held that "attorney's fees awarded under 42 U.S.C. § 1988 *must* be adjusted downward where the plaintiff has obtained limited success on his pleaded claims, and the result does not confer a meaningful public benefit." *McCown*, 565 F.3d at 1103. While the *McCown* stated that the test to be followed is not one of strict proportionality, a comparison of damages awarded to damages sought is *required. Id.* at 1104. Citing *City of Riverside v. Rivera*, 477 U.S. 561, 586 (1986), the *McCown* court noted that "in judging the plaintiff's level of success and the reasonableness of hours spent achieving that success, a district court should 'give *primary consideration* to the amount of damages awarded as compared to the amount sought.'" *McCown*, 565 F.3d at 1104; emphasis added.

The *McCown* court then analyzed case law in this circuit that "provides additional guidance in how to measure a plaintiff's level of success when the plaintiff has prevailed on some, but not all his claims." *Id.* The Ninth Circuit specifically cited to *McGinnis v. Kentucky Fried Chicken*, 51 F.3d 805, 808, 810 (9th Cir. 1994), where it had reduced Plaintiff's fee award, stating that "'[l]awyers might reasonably spend $148,000 worth of time to win $234,000[, b]ut no reasonable person would pay lawyers $148,000 to win $34,000.'" *McCown*, 565 F.3d at 1104.  In *McGinnis*, the Ninth Circuit held that "the district court abused its

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

11

discretion by expressly refusing to relate the extent of success to the amount of the fee award." *McGinnis*, 51 F.3d at 810.

Turning then to McCown's claim, the Ninth Circuit noted that he had received $20,000 in damages as part of a settlement agreement for his single remaining claim, and no other relief; that the amount received was roughly one-fourth of the damages in excess of $75,000 that he pled in his complaint, and less than one-tenth of the $251,000 he requested in settlement. Thus, it concluded that McCown's victory clearly fell "far short" of his goal; therefore, "it is unreasonable to grant his attorneys more than a comparable portion of the fees and costs they requested." *McCown*, 565 F.3d at 1104-1105.

The Ninth Circuit then turned to McCown's argument that his attorney's fees should be granted in full because, while his monetary success was limited, he achieved an "excellent result" since his success conferred a benefit on the public. The *McCown* Court recognized that both the Ninth Circuit and the U.S. Supreme Court have held that results may not be measured solely in terms of damages, and "'in determining a reasonable fee award on remand, the district court should consider not only the monetary results but also the significant nonmonetary results [the plaintiff] achieved for himself and other members of society.'" *Id.* at 1105, citing to *Morales v. City of San Rafael*, 96 F.3d 359, 365 (9th Cir. 1996). It also noted that the Supreme Court has likewise indicated that "when a decision has 'served the public interest by vindicating important constitutional rights' an award of attorney's fees that is disproportionate to the actual damages may be appropriate." *McCown*, 565 F.3d at 1105, citing *Rivera*, 477 U.S. at 572. "'The public benefit of a suit must have enough of an impact to justify a fully compensatory fee award despite limited success on damages claims.'" *McCown*, 565 F.3d at 1105.

For example, in *Wilcox v. City of Reno*, the Ninth Circuit emphasized that the significant public benefit from the plaintiff's case merited an award of fees

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

12

even though the plaintiff recovered only nominal damages. 42 F.3d 550, 556 (9th Cir. 1994). In that case, the "jury determined a city policy to be unconstitutional, and further determined that the policy caused injury to [plaintiff]." *Id.* The Ninth Circuit described these results as "admirable" and found that the "litigation likely precipitated both the disciplining of [the defendant officer] and the change in [the city's] policy." *Id.* The court concluded that the "judgment...will benefit the City and its residents by preventing the police department from reverting to its old policy or a similar policy some time in the future." *Id.* at 556-57.

In *Rickley v. Cty. of Los Angeles*, No. CV 08-4918 SVW (AGR), 2011 WL 13201909, at *4, n.5 (C.D. Cal. Dec. 14, 2011), the court noted that it would not be inclined to find that the plaintiff's lawsuit conferred a meaningful public benefit even if the plaintiff had presented this argument to the court. Citing to *McCown*, it noted, "[e]very successful Section 1983 case benefits the public in some way, because constitutional rights are upheld and preserved. In this case, however, while Plaintiff's individual right of free speech was vindicated to some extent, Plaintiff has failed to demonstrate (or argue) that the public at large was benefitted in any meaningful way." *Rickley* at 4, n.5. In examining the facts of the litigation and the relief obtained, the *Rickley* noted that they were "uniquely Plaintiff-centric." *Id.* For example, the plaintiff did not obtain an injunction prohibiting endemic unconstitutional conduct by the defendants, or effect a beneficial change in county policy. Nor did the plaintiff demonstrate that the action would meaningfully deter future unconstitutional conduct by the defendants or others. *Id.*

More recently, the District Court reached a similar conclusion in *Young*, 2017 WL 3184167, at *9. The court noted that the plaintiff could not successfully argue that his award "affected a change in policy or a deterrent to widespread civil rights violations" when he was only successful on one out of twelve claims against one out of sixteen defendants at a third re-trial. *Id.* The court also noted that the plaintiff had failed to establish that the case had such novel and/or

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

13

difficult questions that it required such a substantial attorney's fees award in light of the jury award, stating:

> "While this case has been litigated from 2007 with various appeals to the Ninth Circuit, there is nothing in the record to indicate that this case took over [the plaintiff's counsel's] practice such that he spent more time on it than other cases to the point he was unable to take on other matters. Other than the appeals, this was a straightforward case where the trials included repeated witness testimony and the presentation of the same legal theories. Plaintiff has failed to show the Court that this case, while prolonged for several years, raised difficult legal theories warranting such a high award given the jury's damages award. Given the experience, reputation, and ability of [the plaintiff's counsel] along with the results obtained, an overall reduction in the lodestar figure is appropriate. The Court cannot separate the billing entries to determine which entries were for Plaintiff's one successful claim against Defendant Wolfe. Accordingly, the lodestar figure is reduced 45% to account for Plaintiff's limited success in prevailing on one claim against one Defendant." *Id.*

Here, from a monetary standpoint, Plaintiff's success was extremely limited. Plaintiff succeeded on only one portion of one claim against one Defendant. (Judgment, Dkt. 303.) And, even for the one claim on which she prevailed, Plaintiff's amount of success was severely limited. The jury strictly circumscribed its finding that Higgins used excessive force with the additional finding that his use of excessive force was not a substantial factor in causing Zion's death:

> "Question 11: Was Michael Higgins's excessive force a substantial factor in causing Connor Zion's death?
>
> Yes ___     No X" (Judgment, Dkt. 303, 3:4-5.)

The jury further limited the award to Plaintiff with its finding that Higgins did

14

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

not act with malice:

> "Question 3: Do you find that Michael Higgins acted with malice or oppression, or engaged in despicable conduct?"
>
> Yes ___    No <u>X</u>" (*Id.* at 2:1-4.)

Plaintiff sought compensatory and punitive damages in excess of $25 million for multiple violations of the Fourth and Fourteenth Amendment, *Monell* violations, and for violations of multiple state law claims including wrongful death, negligence, intentional infliction of emotional distress, battery, and California Civil Code § 52.1. Plaintiff's case was always about their claim that Defendants' wrongful conduct caused Zion's death. Indeed, the vast majority of time spent litigating this case by Plaintiff's attorneys, Hadsell, Stormer, and Reznick, was their effort to develop facts for their theory on causation of death. For example, all of their work with regard to expert discovery of the decedent's brain tissue solely went to this issue.

The case went to trial on the claim that a constitutional violation caused Zion's death. This is the case the Plaintiff prepared and tried to the jury. The jury answered this theory of liability and recovery resoundingly in the negative. Plaintiff simply did not succeed in the primary goal of their litigation.

Nor did Plaintiff achieve an "excellent result" with regards to the policy aspects of this litigation. Plaintiff did not obtain a finding that the County's customs, policies or practices or that its training program caused a constitutional violation. That claim was adjudicated in the County's favor on summary judgment, which was upheld on appeal. Thus, no policy change will be effected by this verdict.

The judgment in Plaintiff's favor also is unlikely to send a message regarding the use of excessive force. First, it is unclear what force was used that the jury deemed to be excessive. It could not have been the first nine shots as the Ninth Circuit held those were not excessive force. It could have been any one (or possibly all) of shots 10 through 18; however, that is unknown. It also could have

1390614.1

been the kicks to the head either alone or in conjunction with shots 10 through 18, but again, that is unknown. It is pure speculation as to what force it was that Higgins used that the jury found to be excessive. Therefore, it cannot be said that any particular message was being sent by the finding that Higgins used excessive force. Second, punitive damages were not awarded and the jury specifically found that Higgins did not act with malice. If the jury intended to send a message, then a finding of malice could have been a possible way to do that, but it did not.

The jury sent no clear "message" to the County or Higgins regarding his attempt to respond appropriately and effectively to this frightening and tragic incident – an incident where a deputy was violently attacked[1] and gravely wounded, where Plaintiff and Connor Zion's roommate were attacked and injured and fled for safety, and the peace of a community was shockingly disrupted, all at Zion's hands. Higgins responded to an emergency call for help and the jury verdict recognizes this fact. The verdict reflects the essential reality of this case by finding a "technical" unreasonable force violation, without the malevolent intent or institutional failings normally associated with a serious deprivation of constitutional rights. If ever there was a tepid victory that did not achieve a broad vindication of constitutional rights, it is the jury award in this case. In examining the facts of the litigation and the relief obtained, the only reasonable conclusion to be reached is that they were "uniquely Plaintiff-centric." See *Rickley* at 4, n.5. As such, a reduction should be imposed on the net award by 75% to ensure that the fees awarded do not overstate the very limited results achieved in this litigation. (Kaufman decl., ¶34, 51:24-25.)

///

///

---

[1]   And in apparent recognition of this violent attack, the jury found that Zion himself was 73% at fault on the wrongful death (negligence) claim while only placing 9% of fault on Higgins. (Judgment, Dkt. 303, 2:17-24.)

16

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

**B.**    **Defendant Should Not Be Substituted as the Victim of Plaintiff's First Counsel's Alleged Malpractice**

Plaintiff discusses at length in her motion the efforts undertaken by her third firm of attorneys (Hadsell Stormer & Renick) to correct discovery and other "issues" alleged to have been errors by her first attorney who took two depositions, failed to serve written discovery requests, obtained no documents from Defendants beyond their Rule 26 initial disclosures, failed to designate experts and rebuttal experts, and failed to depose Defendants' experts. (Motion, 3:20-4:1.) Hadsell Stormers' efforts to re-open discovery that had been closed for multiple years is described on pages 5:18-6:25 of Plaintiff's motion. Now, Plaintiff seeks an award of fees to compensate Hadsell Stormer for the time it spent attempting to remedy the alleged malpractice of Plaintiff's first attorney.

If Plaintiff is the victim of alleged malpractice by her first attorney in not seeking timely discovery, etc., she has a remedy for that wrong. Defendants did not cause her first attorney to proceed in the manner that he did, and are not responsible for the situation he created that Plaintiff's third counsel believed they needed to remedy. Defendants should not be substituted for the Plaintiff as the victim of the alleged malpractice by her first attorney, and they should not be made to pay her third attorneys their fees to correct it. Defendants have no remedy for the alleged malpractice committed by Plaintiff's first counsel and such a substitution of Defendants in the role of victim is patently unjust. Thus, none of the fees incurred and sought by Hadsell Stormer for their work in attempting to remedy what they allege was attorney malpractice by Plaintiff's first counsel, including their efforts undertaken to re-open discovery, should be awarded and the requested fees should be reduced accordingly. (Kaufman decl., ¶29, 47:25-48:19.)

**C.**    **The Hours are not Reasonable**

Plaintiff argues that all of the claims she lost or abandoned are related factually and legally to the one claim she prevailed on, and, incredibly, that not one hour was

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

17

expended by her attorneys that would not have been spent litigating "a naked Fourth Amendment claim." (Motion, 18:22-15.) Plaintiff's contention is quite convenient, overreaches, and ignores the reality that they were only partially successful on the Fourth Amendment claim.

Plaintiff's claims may be factually and legally divided into four categories: 1) the Federal Civil Rights Claims; 2) the State Civil Rights Claim; 3) the *Monell* Claims; and the 4) state wrongful death and personal injury claims. These four categories of claims have different damages, different elements of proof, and are not dependent upon the same facts. On three out of these four categories of claims, the Defendants prevailed. Defendants also prevailed on punitive damages. Further, Defendants were 100% successful on all claims brought by Plaintiff Kimberly Zion individually.

Plaintiff's attorneys Hadsell Stormer's voluntary 5% reduction of fees is insignificant in relationship to the number of hours expended, their billing rates, and the total fee of approximately $1.2 million. Plaintiff's claimed billings are excessive, unnecessary, and reflective of improper billing procedures. (Kaufman decl., ¶¶26-28, 45:21-47:24, ¶¶30-35, 48:20-52:13.)

### D.     The Rates are not Reasonable

Reasonable hourly rates are "the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). In this regard, the *Blum* Court stated: "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 896, n.11.

Plaintiff's attorneys have failed to meet their burden of producing satisfactory evidence to justify their rates. Indeed, the do not justify their rates by reference to the

1390614.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

Orange County legal market at all. (Motion, 16:11-21.) Instead, they request fees based on their current rates, to account for delay in payment and reference declarations concerning their expertise and reputation. (*Id.*)

Plaintiff failed to establish that the requested rates are proper with objective evidence. Plaintiff's declarations consist of conclusory statements and anecdotal information, not surveys or studies of billing rates, and therefore do not provide support for a finding that Plaintiff's counsels merit particularly high rates. (Kaufman decl., ¶9, 30:19-36:2.)

In contrast, the declaration submitted by Defendants' expert, Robert Kaufman, supports his conclusions with substantial surveys of law firms, supplemented by other studies. He then calculates the fee rates based on the geographical of Orange County, in which jurisdiction the case was filed and tried, where all parties and one of two counsel reside, and where all relevant underlying events occurred. He also took into account differences in fee rates from the studies he used based on attorney experience and seniority, firm size, and type of litigation. (Kaufman decl., ¶¶15-17, 39:7-40:13.) After analyzing five different benchmarks, he concluded that the rates for the Hadsell Stormer firm should be set at $550 for Dan Stormer, $475 for Cindy Pánuco, and $375 for Brian Olney. (*Id.* at ¶¶18-24, 40:14-45:6, ¶25, 45:8-20.)

### E.    The Number of Plaintiff's Attorneys was Excessive

Appearances by multiple attorneys is unreasonable where only one substantively participates. The extra attorneys are duplicative and inefficient. One cannot bill for three attorneys when one – or at most two – would have sufficed. *Democratic Party of Washington State v. Reed*, 388 F.3d 1281, 1286 (9th Cir. 2004) ("Just as there can be too many cooks in the kitchen, there can be too many lawyers on a case."),

Here, Plaintiff was represented by three attorneys at mediation and at trial. The most active attorney was Mr. Stormer. Ms. Pánuco and Mr. Olney played much more limited roles. At most, Plaintiff's case should have been staffed with only two

19

attorneys, as was Defendants' defense. The fees for overstaffing of both events should be reduced. (Kaufman decl., ¶28, 47:6-24.)

### F.    Block Billing is Impermissible and Requires a Reduction

To some extent, Plaintiff relied on block billing. This impermissibly obscures how much time is allocated to specific tasks. Because block billing is heavily disfavored, it deserves a 10%-30% across the board reduction. Cases have reduced block billed entries by across the board factors of between 20% and 88.17%. *Christian Research Institute v. Almor*, 165 Cal. App. 4th 1315, 1325-1326 (2016); *Welch v. Metropolitan Life Insurance Company*, 480 F.3d 942, 945 (9th Cir. 2007); *Lightbourne v. Printroom, Inc.*, 2015 WL 12732457, 9 (C.D. Cal. 2015)) A reduction of 15% in this case is appropriate to account for the difficulty in determining how much has been billed to any one item caused by block billing. (Kaufman decl., ¶27, 46:2-47:5.)

### 4.    STEERING'S FEES SHOULD BE REDUCED

Plaintiff's first lawyer, Jerry L. Steering, represented Plaintiff from 2013 through November 2017, during the initial proceedings in the District Court and through appeal. The Law Offices of Jerry L. Steering requests attorney's fees in the amount of $118,755.00. A deduction in an amount representing the time spent on the *Monell* claim would be appropriate since the County prevailed on that claim. Also, within Mr. Steering's billing are billings from three other individuals, two of them unidentified attorneys with no information provided. These fees should be reduced in their entirety. (Kaufman decl., ¶14, 38:18-39:4.)

### 5.    DUNN'S FEES SHOULD BE DENIED IN THEIR ENTIRETY

Plaintiff's second lawyer, Brian Dunn of the Cochran firm, represented Plaintiff from November 2017 to May 2018. He requests fees in the amount of $5,520 for seven hours of work at the rate of $750 an hour. Mr. Dunn makes no attempt to justify either the hours he worked or his hourly rates by reference to the Orange County market and therefore these fees should be denied in their entirety.

20

1390614.1

Plaintiff argued in both this motion and her motion to reopen discovery filed on August 20, 2018, that Mr. Dunn did not adequately represent her because he did not take steps to prepare for trial, did not inform her of the Ninth Circuit argument, and did not assist her in responding to the media when the videos of the police action were publicly released. (Motion, Dkt. 305, 5:12-13; Motion to Reopen Discovery, Dkt. 108, 7:25-8:2.)

Defendants agree with Plaintiff's current attorney's concession that fees for an attorney who worked less than 10 hours on the case should be deleted as not making any meaningful contribution to the case. (Motion, Dkt. 305, 14:24-26.)

## 6. MOST OF PLAINTIFF'S NON-STATUTORY COSTS SHOULD BE DENIED OR, AT THE VERY LEAST, REDUCED

To be recoverable, non-statutory costs must be both 1) normally charged to fee paying clients, and 2) necessary, reasonable, not excessive or duplicative. *Harris v. Marhoefer*, 24 F.3d 16, 19-20 (9th Cir. 1994); *see also Newman v. City of Payette*, 2016 WL 1611430 (D. Idaho 2016) (plaintiff filed a non-statutory request for costs in the amount of $921.90 for two airline flights to Boise, one for a court hearing and the other for mediation and no unreasonable costs such as a hotel). Non-statutory costs must also be supported by necessary detail. *Harvey v. Mohammed*, 951 F.Supp.2d 47 (D.D.C. 2013) (non-statutory costs reduced by half due to lack of detail as to purpose of each entry).

### A. Word Processing is Overhead, No Detail is Provided, and is Not Recoverable

"[W]ord processing is not recoverable, as it is an overhead expense that counsel must bear." (*Lopez v. San Francisco Unified School Dist.*, 385 F.Supp.2d 981 (N.D. Cal. 2005); *Guckenberger v. Boston Univ.*, 8 F.Supp.2d 91, 111 (D. Mass 1998). Plaintiff's counsel, Dan Stormer, does not list word processing as one of the costs he believes is charged to privately paying clients. (Dkt. 305-1, Stormer decl., ¶51, p. 19.)

///

1390614.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

Defendants object to the entire amount of Plaintiff's request for word processing in the sum of $14,983.50 because it is overhead and not normally charged to a fee-paying client. Defendants further object on the grounds that Plaintiff has not provided a contemporaneous record of these charges, rather the invoice is a listing of charges prepared for this motion. Nor has Plaintiff provided any detail to determine what in fact was "wordprocessed" for the amount requested. Rather, Plaintiff's invoice states only a date and the line item: "Monthly wordprocessing-printing/downloading documents/emailing/efiling—(initials)" and a dollar amount. It is impossible to determine from this line item what actual work was performed.

## B.   The Request for Various Office Supplies Should not be Recovered

Plaintiff has requested four separate items for what appears to be paper folders and tabs and an unspecified flat rate per month for "supplies" as follows: $54.00 (monthly supplies), $427.50 (litigation files), $22.50 (Manila folders), $257.55 (Index/Exhibit tabs). These office supplies are completely unsupported by receipts of any kind. No contemporaneous records have been submitted, rather there is a listing of charges prepared for this motion. There is no way to determine what or how much of it was purchased for use in this litigation. Further, Plaintiff's counsel, Dan Stormer, does not list these items as one of the costs he believes is charged to privately paying clients. (Dkt. 305-1, Stormer decl., ¶ 51, p. 19.)

Defendants object to these unsupported items, that are more appropriately attributed to overhead, and request that they be denied in their entirety.

## C.   No Detail is Provided for Photocopying and it Should be Denied or Substantially Reduced

Plaintiff requests $15,068.10 in photocopying costs but does not provide a contemporaneous record or any detail. (Dkt. 305-1, p. 165.) The entries are simply: "$Photocopying Monthly Photocopying-(copier name) (amount." (*Id*.) It is impossible to determine what was copied, for what purpose the copies were made, the number of copies that were made, or the per page cost for the copies. The only information

22

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

provided is a monthly amount in a list that was prepared for purposes of Plaintiff's motion. (*Id.*) Defendant objects to this item on the basis that insufficient detail is provided and requests that it be denied in its entirety or reduced 50% due to lack of detail. *Harvey*, 951 F.Supp.2d 47 (non-statutory costs reduced by half due to lack of detail as to purpose of each entry).

### D. Parking and Mileage Should be Limited to Items with Documentation

Plaintiff requests a lump mileage/parking reimbursement of $28 for Mr. Stormer, $520.44 for Ms. Pánuco, and $741.02 for Mr. Olney. Mr. Stormer submits four parking entries on his credit card statement in the amount of $7.00 each. Defendants do not challenge this amount.

It appears that no parking receipts were submitted by Ms. Pánuco. One reimbursement check from Hadsell Stormer to Ms. Pánuco dated 10/3/18 indicates a memo entry of $64.53 for mileage to and from "Media." (Dkt. 305-1, p. 171.) Traveling to and from "media" is not a necessary expense for this litigation and should be denied. Two more checks are submitted from Hadsell Stormer to Ms. Pánuco with what appear to be lump sum mileage reimbursements in the amounts of $85.40 and $370.51. Ms. Pánuco has provided no log or other backup documentation for the dates, miles, destination, or event to justify these lump sums and they should be denied. Thus, all of the mileage/parking lump sum request for of $520.44 for Ms. Pánuco should be denied.

Mr. Olney submits a mileage and parking log and seeks reimbursement in the amount of $741.02. He logs mileage and parking for travel to and from his home and court on January 9, 10, 16, 17 and 22, 2019, in the amount of $267.58. The presence of three lawyers at trial, Mr. Stormer and both Ms. Pánuco and Mr. Olney, is unreasonable overstaffing. (See Kaufman decl., ¶ 28, 47:6-24.) The full amount of mileage and parking reimbursement for Mr. Olney should be reduced by 50% to correct this unnecessary expenditure.

23

1390614.1

### E.   All Non-Statutory Costs Should be Reduced to Reflect the Limited Success of Plaintiff

It is permissible for the court to reduce non-statutory costs to reflect the limited success of the plaintiff in this litigation:

"[T]he district court may reduce costs to reflect limited success on the merits, *see e.g., Bryant v. City of Chicago*, 200 F.3d 1092, 1102 (7th Cir. 2000), cert. denied, 531 U.S. 821, 121 S.Ct. 64, 148 L.Ed.2d 30 (2000); *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1258 (10th Cir. 1998)," but it is not required to do so…." *Cummings v. Connell*, 316 F.3d 886, 898 (9th Cir. 2003), emphasis in original.

In this matter, given the very limited success, and the excessive amount of costs and non-statutory costs claimed, Defendants request that an overall deduction in the amount of 75% be taken. (Kaufman decl., ¶34, 51:24-25.)

## 7.   CONCLUSION

Plaintiff is correct when she states in her motion that an "extraordinary" verdict was received. What was extraordinary about it, however, was how over-all successful Defendants were in this case. Faced with 11 separate claims being made against the County and Higgins, ultimately only four of them, plus the punitive damages claim, proceeded to jury trial, with the other seven being resolved in Defendants' favor. In particular, the case was only tried as to the Fourth Amendment excessive force claim, the Fourteenth Amendment violation of due process claim, the state law wrongful death claim, and the state law Bane Act claim. Of those fourth claims, Defendants prevailed entirely on three, as well as on the punitive damages claim.

Extraordinarily, in this case where Plaintiff's main focus was to establish that Higgins wrongfully caused Zion's death, Plaintiff was unsuccessful in proving her case. The jury returned a verdict that, while it found Higgins used excessive force, it also found that this excessive force was not the cause of Zion's death. *Essentially, because the jury found the excessive force was not a substantial cause of Zion's death, it found that Higgins's use of deadly force was objectively reasonable.*

1390614.1

1    As a result of this verdict, Plaintiff in her individual capacity was not awarded

2  any damages for the loss of her son. Plaintiff in her representative capacity was only

3  awarded non-economic damages that were suffered by Zion prior to his death. Given

4  the limited monetary victory achieved by Plaintiff in this matter, as well as the lack of

5  public benefit (and also given the overbilling and excessive hourly rates being

6  requested), Plaintiff's request for attorney's fees should be substantially reduced in the

7  amounts more particularly set out in the accompanying declaration of expert Robert

8  Kaufman.

9  DATED:  March 4, 2019                    WOODRUFF, SPRADLIN & SMART, APC

10

11                                         By: s/ *Jeanne L. Tollison*_____
                                               DANIEL K. SPRADLIN
12                                             JEANNE L. TOLLISON
13                                             Attorneys  for  Defendants  COUNTY  OF
                                               ORANGE and MICHAEL HIGGINS
14

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1390614.1

# **DECLARATION OF ROBERT L. KAUFMAN**

I, Robert L. Kaufman, declare and say as follows:

I am an attorney at law duly licensed to practice before all the courts of the state of California, the United States District Courts for the Central and Southern Districts in California, the Ninth Circuit of the United States Court of Appeals, the United States Tax Court, and the United States Supreme Court. I am a Senior Trial Counsel in the law firm of Woodruff, Spradlin & Smart, a law firm of about 45 attorneys primarily representing public entities in various litigation and transactional matters all over Southern California, including civil rights and other types of cases in which the prevailing party may seek attorney's fees. I have reviewed the motion for attorney's fees and related declarations (and exhibits thereto) filed by Plaintiff in this action, as well as the opposition thereto. In addition, I have reviewed relevant pleadings and motions, as well as the orders of the Court and the judgment of the jury. I also have performed my own research regarding the attorneys seeking fees in this matter, as specifically set forth below. Based upon this information, as well as my background, training, and experience, I am competent to and do testify to the following factual portions of this declaration on personal knowledge and render the opinions in this Declaration. This declaration is made under penalty of perjury insofar as it makes factual assertions or states my expert opinions.

### *The Facts and Procedural Setting*

2.     This case was and is a civil rights case, in which all parties reside, and the events upon which the suit is based all occurred, within the County of Orange. None of Plaintiffs' attorneys have practices venued within the county borders. No reason for eschewing competent Orange County counsel has been offered.

The core claim in this case was based on the death of Connor Zion, allegedly at the hands of law enforcement officers employed by the County of Orange, who were supposedly using excessive force. In short, the death occurred after a confrontation created by Mr. Zion to which police were called by civilians. After the police arrival,

26

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

the confrontation continued, during which Mr. Zion was admitted to having been out of control; he had caused injury to others using a knife, and continued to similarly attack and injure the officers responding to the call. The police eventually subdued Mr. Zion with gunfire and physical blows. Plaintiff are Mr. Zion's mother, Kimberly Zion, who appears both in her individual and representative capacities.

Originally, there were 11 causes of action for violation of the 4th and 14th Amendments, "Monell" claims, causing death without due process, "Bane Act" state civil rights claims, negligence, battery, wrongful death, and intentional infliction of emotional distress. The case was tried to what Plaintiff describes as a "unanimous" verdict, which, of course, is the only kind one gets in federal court. Either due to court rulings or the verdict of the jury, Defendants prevailed on **nine of the eleven** causes of action. The jury found **no** causation by Defendants in the death of Mr. Zion, and **no** damages of any kind that were caused Kimberly Zion (individually) by Defendants. The jury found $360,000.00 in general damage caused to the late Mr. Zion by the excessive force used by Defendants. No punitive damages were found.[2]

In other words, Defendants prevailed on **91%** of the causes of action as to Connor Zion, and **all** causes of action as to Kimberly Zion, individually. Defendants also prevailed on **causation of death** issues and on **punitive** damages.

Plaintiff now seeks $1,313,644.02 in attorney's fees, or an amount equal to a contingency fee of 365%.

### *My Retention and Qualifications as an Expert Consultant in this Case.*

3.     The purpose of this Declaration is to offer my expert opinion on the issue of the reasonable amount of attorney's fees, if any, that should be awarded to plaintiff(s) and/or its counsel pursuant to the motion in this case. I am not offering any conclusions or opinions on the merits of this case.

---

[2]   While Plaintiff claims she "largely prevailed" on the parties' motions in limine, this is not quite correct. Out of twelve total motions, it appears that Plaintiff won three, Defendants one, and the rest were partially won and lost by both parties. Therefore, Plaintiff was only slightly more than 50% successful.

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1390614.1

4.   I have been asked, based upon the above referenced information and review, as well as my experience and expertise summarized below, to render opinions as to (A) the reasonable number of hours spent by Plaintiff's counsel in the partially successful prosecution of this matter, (B) the reasonable attorney fee rates for attorneys of the same or similar skill as Plaintiff's counsel who represent plaintiffs in cases of this type in the relevant geographical market (the County of Orange), and (C) the final amount of attorney's fees that I believe are reasonable under the circumstances in this case after applying the law to the facts and exercising my judgment in light of my experience and expertise. I have **not** been asked to render an opinion on the non-attorney-fee costs sought by Plaintiff or the merits of this case and, accordingly, I offer no such opinions herein.

5.   Attached as Exhibit A is a copy of my most recent professional biographical summary, last updated in late 2018. Exhibit A is incorporated by reference as though set forth in full. I am certified by the National Association of Legal Fee Analysis as an expert in the auditing and determination of reasonableness of attorney fees sought in legal disputes. This is not true as to any of the attorneys submitting support for Plaintiff's position in this motion.

6.   As stated in Exhibit A, I have been a member of the California State Bar since 1975, which was also the year I graduated from U.C.L.A. School of Law. I have served as a Deputy District Attorney or civil trial lawyer ever since. I have tried approximately 125-150 jury trials in state and federal courts, both civil and criminal, in California, and have been lead counsel in about 150 appellate matters across the United States. I have been an instructor in law school (Remedies, Legal Research and Writing, and Trial Advocacy), as well as in the Jack Daniels Trial Advocacy School. I have given seminars, including seminars in the determination of reasonableness of attorney fees, before the Federation of Defense and Corporate Counsel, California State Bar, Santa Monica Bar Association, L.A. West Inns of Court, Los Angeles County Bar Association, Orange County Bar Association, the Association of Southern

1390614.1

California Defense Counsel, and the Association of Defense Counsel of Northern California and Nevada. Both before and after I joined my current firm, I represented defendants (and on rare occasion, plaintiffs) in both tort and contract matters in federal and state courts. I have served as both a consultant and an expert witness regarding review of the reasonableness and propriety of attorney fee billings and requests on behalf of both plaintiffs and defendants to civil rights cases, as well in other contexts for insurance carriers (*i.e.*, monitoring and consulting on billings to insurers by independent [aka "Cumis"] counsel). I also represented an insurance carrier (Industrial Indemnity, aka Westchester Specialty) in both state and federal court in the infamous litigation concerning the widespread insurance fraud of the "Alliance," in which members of a large conspiratorial group of attorneys and paralegals were eventually disbarred, suspended, and/or imprisoned for fraudulent billing practices. In connection therewith, I was twice asked by **both** sides in state bar reinstatement proceedings to testify at the same hearing, each stating they were confident in my impartiality and integrity. The cases in which I have testified as an expert witness were in both state and federal courts, and dealt with such diverse areas of law as torts, contracts, employment law, minor's rights in education and imprisonment matters, and civil rights law in which, as here, a partially or completely successful plaintiff sought an award of attorney's fees. I have been a member of American Board of Trial Advocates and was designated a "Superlawyer" in Southern California on multiple occasions. I have been listed in the international edition of the American Registry as a top lawyer in the California region. Martindale Hubbell rates me as AV ("A" denotes a finding of "very high" legal ability and "V" means ethically sound) and AVVO rates me as 10/10. I am a member of the Federation of Defense and Corporate Counsel. My entire career has been spent practicing litigation and trial law, primarily in California and, since 1979, I have always (except on two isolated occasions) billed an hourly rate, keeping contemporaneous time records.

///

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

29

***The Generally Accepted Method of Evaluating Attorney Fee Award Requests.***

7.     In reviewing an attorney's billings, one should always remember the principle which I have dubbed "The Golden Rule of Billing"; *i.e.*, "Bill unto Others as You Would Have them Bill unto You." In other words, a general test to apply to any single given billing entry is "How would I feel if my attorney billed me that way?" In that regard, attorney fees, in the end, are creatures of contract; as such, the client and the attorney may agree to any billing criteria they wish, so long as it is ethical, legal, and the client is fully informed before agreeing to the methodology. This becomes relevant to my opinions in this case.

8.     While one should apply the above "Golden Rule" to any single billing entry, the overall method of evaluating the bills is set forth as a matter of law, and is called the "Lodestar Method." Plaintiff, in her motion, acknowledges this, but does not fully explicate that method, leaving out the critical requirement that the market for fee rates to be used is the local market where the case in venued, and that out-of-area rates are only used if a plaintiff proves he tried and could not find competent counsel in the locale. Given the nature of the sophistication of the Orange County Bar, that could not be done and has not even been tried. Nor does Plaintiff take into account the mandatory criterion of firm size since this invariably impacts fee rate.

9.     One first evaluates and determines the reasonable hourly rate(s) to be charged by each billing entity, as measured by the **specific** market rate (**not** a self-interested anecdotal rate) for similar attorneys in the same or similar geographical area as the locus of the case handling cases of similar nature and complexity, also taking into account the experience, expertise, **firm size**, and reputation of each individual billing entity in that specific field of litigation.[3] *Hensley v. Eckerhart*, 461 U.S. 424,

---

[3]     Plaintiff also claims that an attorney should be judged for rate setting purposes based on his or her awards received. (Motion, 16:19) This is partially true, but ultimately misleading. Certainly, there are awards which are sincerely earned and deserving, and those should be factored into the "reputation" of the attorney. But others must be "taken with a grain of proverbial salt," since, like certain awards in the entertainment industry, they are often awarded to each other by attorneys, defense and

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

430, fn. 3 (1983); *Welch v. Metropolitan Life Insurance Company*, 480 F.3d 942, 946 (9th Cir. 2007); *PLCM Group, Inc. v. Drexler*, 22 Cal. 4th 1084, 1095 (2000); *Bihun v. AT&T Information Systems, Inc.*, 13 Cal. App. 4th 976, 997 (1993), disapproved on other grounds, *Lakin v. Watkins Associated Industries*, 6 Cal. 4th 644, 657 (1993). Using these criteria, I have determined the reasonable market fee rate for each billing attorney on the case. On the other hand, in determining these rates, Plaintiff's supporters have erred in their attempts to establish such a market rate in several ways, including, but not limited to, the following ways.

a. The market rate is presumed to be the specific jurisdiction of the court of venue. (See authority in preceding paragraph, *supra*) In 2015, the 9th Circuit, in an unpublished opinion, decided *Shirrod v. Director OWCP*, in which error was found by a court that used a market other than the place the case was venued. To overcome this presumption, a fee applicant must show that he or she made a reasonable effort to find competent counsel within the jurisdiction, but could not. In the sophisticated Bar of metropolitan Orange County, this would be impossible to show, and Plaintiff, appropriately, did not even try.[4] Nevertheless, her expert witnesses all consistently tried to use fee rates and awards from all over California to establish the market rate herein, particularly the areas of San Francisco and Los Angeles, which are notoriously (and as will be later demonstrated) 12% or more higher than the Orange County market.

b. Mr. Witt's "Tables" are illustrative. Table I includes 113 different attorneys (some are listed more than once), plus a number of non-attorneys (paralegals, law clerks, and even non-professional student

plaintiffs, in a self-congratulatory, nepotistic bolstering of each other's reputation for marketing purposes. Still other awards can be simply purchased.

[4]   Plaintiff did state that she tried to find other attorneys, but those attorneys were located in Los Angeles County, not Orange County.

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

clerical help). Although this seems like a thorough study, his footnotes show that he had referenced those attorneys and non-attorneys from **only 37** different awards of fees (some of the cases involved awards to 14 or 15 different billers) over the **last 12 years**. This is hardly a representative sampling. Nor is there any indication (a) whether the venue was in Orange County, San Francisco, *etc*., (b) the degree of success achieved in the case, or (3) the complexity of the case.

Table 2 does not even purport to concern civil rights cases, but is instead directed to commercial law cases, presumably to support Ms. Sobel's theories on charging the market. It cites awards to 43 different named attorneys, **143 "unnamed"** attorneys, **nine non-attorneys, and 3 "multiple associates."** The results are spread over an **11**-year period and only **16** cases (9 of which are **over 10 years old**).

In summary, these Tables are utterly worthless in determining the **Orange County** market for **civil rights** attorneys in **2018**, which is the only question here.

c. Plaintiff's other experts' opinions are similarly flawed. Ms. Sobel also selected Los Angeles cases and not Orange County cases, and her opinions were based solely on anecdotal evidence. (See, e.g., 416, 3:20) But Ms. Sobel went further. She did not really support the legally required use of cases of **the same type**, let alone in the **same jurisdiction**. Indeed, she admitted to the Court that her analysis included consideration that civil rights attorneys ask for and receive 20%± less than commercial attorneys, and urges use of commercial rates herein, but gives no disciplined reason for that departure from mandatory law. This is completely improper.[5]

---

[5]   Indeed, Ms. Sobal's methodology is telling. She would first increase the market rate for civil rights attorneys by 12%± by using Los Angeles/San Francisco rates, and then

"[R]ates sought by attorneys engaged in public interest litigation and civil rights attorneys are at least ten to twenty percent lower, and in some instances even more so, than the rates of comparable attorneys in commercial firms [, whereas the level of competency of] small boutique civil rights and public interest law forms is equal to and often greater." (Sobel Decl., ¶7, 2:17-28)

d. Another flaw in Plaintiff's analysis is the criticism of use of broadly-based surveys, because they include hourly rate charges.[6] Well, that is exactly what this Court is trying to determine -- an hourly rate in the market. Moreover, these surveys are more reliable for several reasons. First, they are more broadly-based, surveying many more attorneys and firms in the relevant jurisdiction, and they can sort out rates by geographical market, type of case, firm, size, and level of attorney experience, none of which is done by Plaintiff's anecdotal methodology. In determining the market, it is proper to use all attorney's fees in the market, including defense rates in civil rights cases, is specifically permitted by the courts; they simply are neither a starting point not binding. *Coles v. City of Oakland*, 2007 WL 39304 (January 4, 2007); *Treveno v. Gates*, 99 F.3d 911 (9th Cir. 1996) The same is true for

---

another 20%± by using commercial market rates, thereby improperly and artificially increasing the market rate herein by a cool 34% (1 X 1.2 X 1.12 = 1.34). Taking Plaintiff's request down 34% to account for this, one obtains an adjusted request, this time for civil rights rates in Orange County, of $867,005.04, before consideration of reductions I suggest infra.

[6]   Ms. Sobel also complains that these surveys do not use the "lodestar" method, either. But that makes no sense at all. The "lodestar method" is for determining overall fees, not the market rate used in that calculation; i.e., reasonable market rate X reasonable number of hours. There is no "lodestar method" for determining the rate factor alone.

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1390614.1

contingency fee rates. (See *infra*)

e. Indeed, the Ninth Circuit has specifically decried the folly of eschewing use of defense rates altogether and, instead, using anecdotal, self-serving, mutual back-scratching of plaintiffs' counsel[7] in determining attorney fee rates in lodestar situations:

> "'Private attorneys' include both plaintiff and defense civil rights attorneys. In the absence of evidence of the **actual** fee charged by **both** defense and plaintiffs' lawyers, it would be difficult to police against artificially inflated fees supported by only one segment of the bar's affidavits in connection with one another's fee petitions." *Puckett v. Yamhill County*, 145 F.3d 1340, ¶11 (9th Cir. 1998); *see also, Davis v. City & County of San Francisco*, 976 F.2d 1536, 1547 (9th Cir. 1992).

Similarly, it is proper to consider the level of a normal contingency fee, although it is no more a starting point nor ultimately controlling than defense fee rates. The argument for not considering contingency fee rates is that plaintiff's attorneys sometimes lose, and therefore, the attorneys collect nothing. As a result, to encourage taking civil rights cases, one should allow much higher fees when the plaintiff does win than normal contingency levels, so as to compensate for losses. This argument is flawed.

But contingency fees are already skewed higher than a reasonable

---

[7] The actual "normal" rates the applicant attorney charges are largely irrelevant, as unsupported, arbitrary, and self-serving. *Carson v. Billings Police Department*, 470 F.3d 889 (9th Cir. 2006).

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

fee for the particular case, just because of the chances of loss. As one of plaintiffs' expert witnesses in this case admits:

> "Fees of this [contingency] measure are necessary because of the investment in costs, the long delays, and the total or partial lack of success in many cases." (DeSimone Declaration, 304, ¶18, 9:19-22)

f. Finally, plaintiffs' experts and I agree that fee rates must reflect the market in the year(s) during which the litigation took place, in this case 2016-2018, depending on the firm involved. We also agree that some adjustment is thus necessary when the market is determined for a different year, so as to approximate the market in the relevant year(s). However, this is where Plaintiff's experts and I diverge.

First, Ms. Sobel erroneously states that fee rates always increase with time. Not true. Mr. Litt says that a steady rate of increase of 3% per annum is appropriate. Again, not true.

It is common knowledge that great swings in prices of everything occur in the economy over time. Therefore, one cannot apply a single, steady inflation factor over a long period of years as Mr. Litt does for fee awards as old as 11-12 years. The built-in error factor is unacceptable. Secondly, fees do not necessarily increase every year. Indeed, as relevant to the calculations Mr. Litt tries to make in this case for the periods including 2006-2018, the fact is that small firm fees and income actually declined 4.2% in 2011 and 8.0% in 2012. (Law.com, Survey of Law Firm Economics) Therefore, the better method of adjusting fee market rates from different years is to use the unbiased Department of Labor's CPI calculator, which already allows for year-by-year changes up or down. In this calculator, one simply inputs the rate level for one year, designates a

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1390614.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

different year, pushes a button, and obtains the relevant adjusted rate for the latter year. That is the method I used herein.

10.   Next, the reasonable number of hours spent litigating the action are calculated. This involves application of industry standards and ethical parameters in billing practices, with which I am extremely familiar, having complied with them for 41 years. This absolutely requires a line-by-line examination of every billing entry, else one cannot tell if that or any other entry is reasonable or duplicative, excessive, etc. Importantly, **while I have performed this tedious task, no one filing a declaration in support of Plaintiff's motion has done this, or gives any reason for failing to do so.**

This initial part of the evaluation also entails evaluation of (a) the reasonable necessity of the tasks performed, and (b) the reasonableness of the amount of time spent on each such task, thereby (c) determining the reasonable number of hours for which billing is appropriate. Your declarant has now done that required detailed, expert review.

11.   When these two basic tasks have been completed, the next step is to multiply the calculated reasonable hours for each billing entity by his or her appropriately determined hourly rate, thereby reaching a total reasonable fee for that biller's time. This computation results in what is popularly referred to as the initial "lodestar" amount.

12.   Finally, for the sake of completeness, there are times when the lodestar amount must be adjusted up (for particularly difficult cases or where plaintiff's counsel was particularly effective) or down (when plaintiff's counsel only partially won, and also partially lost). In this case, Plaintiff appropriately does not seek an enhancement. After all, there is a mandatory presumption placed upon the federal courts by the Supreme Court to give great deference to the lodestar and assume it properly evaluated the worth of plaintiffs' attorneys' services. One exception to this rule is when a reduction is mandatory under certain limited circumstances; *i.e.*, when

36

the court determines that plaintiff has only partly succeeded and defendant has also partly prevailed. See *Hensley v. Eckhardt*, 461 U.S. 424 (1983)) Plaintiff agrees that "quality of outcome" must be considered in this way. (Motion, 16:23.)

This does not mean, as Plaintiff properly observes, that fees are reduced for every whipstitch, motion, or issue on which Plaintiff was unsuccessful. Some variation is allowed due to the vagaries of the system. However, when entire plaintiffs lose (as here with Ms. Kimberly Zion, as an individual), where issues or claims critical to recovery are lost (such as here, where defendant prevailed on all state issues, two of three 4th/14th Amendment claims, all "Monell" issues, all "Bane Act" state civil rights issues, and all death related issues), and where recovery of wholesale types of important damages are lost (like punitive damages here), the courts must look at the overall result. In this case, as illustrated at ¶2, 2:14-16 of this Declaration, Plaintiff must pay a price for overall lack of success, and indeed, Defendants' comparative success.

### The Appropriate Fee Rates to Use in this Case.

13.    There are seven attorneys and one paralegal/law clerk seeking fees herein. They are as follows:

a.  **Jerry L. Steering** was Plaintiff's first counsel of record. He has decades of experience as a trial attorney and civil rights attorney, and generally competent attorney, with a fine overall reputation. Indeed, 23 of 27 paragraphs in his Declaration are devoted to exposition of his qualifications in this field of law. He avers that his normal fee rate in civil rights cases is $500.00, which sounds about right. However, he has properly discounted his rate herein to $350.00, for the reasons set forth above. I find no reason to quarrel with that self-reduced fee rate. He is seeking $118,755.00 in fees for 339.3 hours of work.

b.  **Brian Dunn** was an excellent 16-year attorney when this litigation began. He also preceded Mr. Stormer's firm, albeit briefly, as Plaintiff's

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

counsel of record herein. He seeks only $5,250.00 in fees in this motion. However, he requests an unreasonably high fee rate of $750.00.

c. **Daniel Stormer** is a well-known civil rights attorney of 36 years' experience when he became counsel herein. He seeks (including anticipated fees for prosecution of this motion) $454,077.50[8]in fees, calculated at $1,150.00 per hour. This fee rate, as will be shown, is exorbitant and unreasonably higher than the relevant market, even for experienced trial counsel.

d. **Cindy Pánuco** was an 8½ year attorney when her firm became of record herein. Her record is one of a competent attorney with experience typical of an 8½ year trial attorney. She seeks a higher than market fee rate of $575.00/hour and a total of $367,616.75[9] in fees.

e. Finally, **Brian Olney** was not even a four-year attorney when his firm took on this case. His experience and competence seems to be at least average for one of his time before the Bar. He seeks, however, a fee rate of $475.00/hour, which is not justified. The total fees he seeks are $235,950.00.[10]

14.    There were three other people who worked on this case. **Mr. Sliverthorn** was with Mr. Steering's firm, and is not an attorney. He bills at $125.00/hour, but we know absolutely nothing on him, his experience, his training, or his competency. This is a gross failure of Plaintiff to carry her burden in this motion, and the fees he seeks herein, however minimal, should be denied entirely. Then, there is an attorney billed as "**Greg.**" This is only his first name, and, without even a last name, it is impossible to support any fee rate for him. We cannot even determine if he is an attorney. The

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

---

8    This number varies slightly from plaintiff's brief, but is gained from itemized review of the bills.

9    See footnote one.

10    See footnote one.

1390614.1

fees he seeks should be denied entirely. Finally, there is an attorney named "**Brenton**" who became an attorney in mid-2016. Therefore, the time he worked on the case was when he was a first-year attorney in Mr. Steering's office. No reason is offered for billing him at $200.00 per hour, the same level as "Greg."

### *Reasonable Attorney Fee Rates in this Case, including Baseline Information and Assumptions*

15.    The next issue is the question of "What is the reasonable rate of compensation for each biller?" What must be shown is (1) the market rate in (2) the relevant geographical area for attorneys of (3) similar quality/experience in (4) similar cases (4) in firms of comparable size. This rate is not supposed to be shown by reference to what any given attorney charges or is awarded, or what is standard or reasonable for other types of cases than the one at issue. *See*, *e.g.*, *Carson v. Billings Police Department*, 470 F.3d 889 (9th Cir. 2006). Anecdotal information about what specific attorneys charge or have been awarded is also improper to use for this purpose, since the relevant standard is the overall market rate in the applicable geographical area (not necessarily where the case is venued, but also considering the location of the parties, attorneys, relevant properties, and where the events occurred) for similar work by similar attorneys in similar sized law firms. This standard lends itself to jurisdiction wide studies. Indeed, in 2009, the federal court imposed a 27.3% across the board reduction, in addition to any other reductions, as a penalty for failing to establish the market rate fees and only submitting self-serving opinions and anecdotal information. *Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2009), overruled on other grounds in *Aguilar v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014).

16.    In my opinion, the best method of determining fee rates in a case such as this is to look to (1) surveys by independent organizations, (2) rates for similar markets, and (3) the geographically adjusted Laffey Matrix. It is true that none of these are controlling, but all are instructive and relevant benchmarks. Together, they

1390614.1

provide an **unbiased** picture of the **actual market** rates to be applied. In addition, to make adjustments to calculated rates from one year to another, the Bureau of Labor Statistics' consumer price index calculator (hereinafter referred to as the "Calculator") is as reliable a method as exists, especially when one uses its cost of legal services component, which it has kept since about 1988. For example, it will tell the court what the fee rate of "X" in 2012 would have likely been in 2014. Its use for this purpose has been specifically sanctioned. *Theme Promotions, Inc. v. News America Marketing FSI, Inc.*, 731 F.Supp.2d 937 (N.D. Cal. 2010).

17.    The geographical area I have used to calculate rates is Orange County, in which jurisdiction the case was filed and tried, where all parties and one of two counsel reside, and where all relevant underlying events occurred. I also took into account differences in fee rates from the studies I used based on attorney experience and seniority, firm size, and type of litigation.

18.    Given various surveys and data, I have identified five unbiased benchmarks for this Court to use in this motion. I rate the sources for each Benchmark as to accuracy in the same order in which the Benchmarks are presented; i.e., the first listed in most reliable, and so on. While no one benchmark is conclusive, each should be applied in conjunction with the others to reach an average fee rate in this market for the Court to apply.

In some cases, the rates obtained are not for 2018 or not for Orange County (but for Los Angeles County). In such instances, I reduce the Los Angeles rate by 12%, as the first Benchmark lists both jurisdictions, allowing me to compare the two. I also will use the Department of Labor's Bureau of Labor Statistics CPI index calculator to adjust the fee rates to 2018 rates.

19.    **I do not have any disagreement with the rates requested by Mr. Steering ($350.00), so he is not included in the rate study below.**

///

///

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

40

**Benchmark One**

20.     Each year, Armanino Group, Inc., which is wholly independent of any attorney group, publishes a survey of attorney's fees in Southern California. The survey is for Southern California, and reports out data for Los Angeles and Orange Counties. Firm size is also considered, as is lawyer experience and seniority. Civil Rights is not singled out as a subject area, but General Liability Litigation is, so I have used the General Liability subject area. As to experience, associates are rated separately for experience and specialty, but partners are not. Therefore, within their specialties, I have accorded Mr. Stormer the 75th percentile rate for partners and the 25th percentile rate to Ms. Pánuco. In order to show the difference between insurance defense and market rates found for general liability litigation, given the unwarranted criticism of the use of such industry-wide studies, I will determine those for comparison purposes only. To illustrate the differences between Orange County rates and Los Angeles rates, I will report on those as well.

The rates are for December 2016, reported in 2017, and need adjustment to 2018 rates, which I have done. On line research shows that Plaintiff's counsels' firm in this case fits into the firm size for firms of 11-20 attorneys or less. Therefore, I have referenced in the study the data for equity partners and associates in Orange County for firms of 11-20 attorneys 2017 study. I further broke down the fee rates into the commercial/real estate litigation category, which is also separately listed. The results of my work is as follows:

| Name | Firm Size | Locale | Specialty | Experience | 2017 Los Angeles Rates | 2017 Orange County Rates | 2018 Orange County Rates |
|------|-----------|--------|-----------|------------|------------------------|--------------------------|--------------------------|
| Mr. Stormer | $650.00 | $575.00 | $655.00 | --- | $626.67 | $551.47 | $574.95 |
| Ms. Pánuco/Mr. Dunn | $475.00 | $430.00 | $475.00 | --- | $460.00 | $404.80 | $422.04 |
| Mr. Olney | $352.00 | $314.00 | $362.00 | $358.00 | $346.50 | $304.92 | $317.90 |

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

1390614.1

Using the same methods, insurance defense rates were 39.8% lower than general litigation, and Los Angeles rates were an average of 12% higher than Orange County.[11]

This is the Court's **First Benchmark** in this matter.

### Benchmark Two

21.   Annually, a detailed survey is published by Wolters Kluwer, www.wkelmsolutions.com, called the Real Rate Report Snapshot. I used the 2016 report, which received and published 2015 data. It surveys data from 5900+ firms, over 146,000 attorneys, spread over about two dozen specialties and 300+ metropolitan areas. Wolters Kluwers is a well-known independent study organization. The study breaks down the geographic market rates for attorneys by specialty and locale. The data from which these computations are drawn is found at pages 96-108. It does not separate our Orange County, but does focus on Los Angeles County. Therefore, I corrected for year and locale, as set forth above. I used General Liability litigation as the specialty area, since, again, civil rights was not broken out separately therefrom. Finally, since Mr. Witt and Ms. Sobel insisted on counting awards to mega-firms and commercial litigation fee rates, I broke out those sized firms and that area of law to show the difference in market.

///

///

///

///

---

[11]   In 2017, the *National Law Journal* reported out its nationwide survey of 2016 fee rates for partners and associates in 956 law firms across the country. The results showed that Los Angeles partners (with 45 firms reporting) charged an average of $531.12 per hour (only two firms had any partner charging over $1,000.00 per hour), and associates charged $383.68 in the 55 firms that reported. In Orange County, 14 firms reported partner rates and 18 reported associate rates. These average rates were $463.39 and $338.19 per hour, respectively. Simple mathematical calculations show that, once again, Orange County rates are 87.3% of Los Angeles rates for partners and 88.1% for associates, for an average of 87.7%.

1390614.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| Billing Unit | 2015 Los Angeles Attorney Fee Rates, General Liability Litigation | 2015 Los Angeles Attorney Fee Rates, Experience Level | 2015 Los Angeles Attorney Fee Rates, Firm Size | 2015 Los Angeles Attorney Fee Rates | 2015 Orange County Attorney Fee Rates | 2018 Orange County Attorney Fee Rates |
|---|---|---|---|---|---|---|
| Mr. Stormer | $416.35 | $386.59 | $244.63 | $349.19 | $307.29 | $327.02 |
| Ms. Pánuco/Mr. Dunn | $416.35 | $334.35 | $244.63 | $331.78 | $291.96 | $310.71 |
| Mr. Olney | $262.68 | $270.94 | $187.35 | $240.32 | $211.48 | $225.06 |

Comparable rates for firms over 500 attorneys in size, using the same methodology, were 61% higher. Again, using comparable methodology, commercial litigation fee rates were 19% higher.

This is the Court's **Second Benchmark.**

> **Benchmark Three**

22. Years ago, the federal courts attempted to find some rigorous way to determine attorney fee rates in cases where the prevailing plaintiff was entitled to fees. The so-called "Laffey Matrix" resulted and was geared to the Washington D.C. area. *Laffey v. Northwest Airlines*, 572 F.Supp. 354 (DDC 1983). Later, the Matrix was adjusted to be applied in other specific geographical areas, including Los Angeles, specifically. This Matrix is designed to account for changes in geographical area and years that the fees were billed. Its use has been approved in federal courts, so long as it is used as a tool, as here, and not a presumptive determination. *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988). Use of this Matrix in California courts was approved in both *Syers Properties III, Inc. v. Rankin*, 226 Cal. App. 4th 691 (2014), and *Nemecek & Cole v. Horn*, 208 Cal. App. 4th 641, 651-652 (2012). In the 2007 version of the Matrix, the 2006 hourly rates for Orange County were given, sub-categorized by experience level. The chart below shows the

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

2007 Laffey Matrix for Orange County (showing 2006 rates), then adjusted to 2018 rates using the Calculator.

| Billing Unit | Years of Experience | 2006 Rates for Orange County | Orange County Rates Adjusted to 2018 |
|---|---|---|---|
| Mr. Stormer | 20 or more | $434.00 | $541.34 |
| Mr. Dunn | 11-19 | $383.00 | $477.73 |
| Ms. Pánuco | 8-10 | $311.00 | $387.92 |
| Mr. Olney | 4-7 | $250.48 | $312.43 |

This is the Court's **Third Benchmark.**

**Benchmark Four**

23.    In 2014, a survey from the National Law Journal Reporter showed average partner rates in Los Angeles County to be **$665.00**/hour in 2014. Again, there was no comparable data for associates. I have adjusted these rates to 2018 Orange County rates for the two partner attorneys.

| Billing Unit | 2016 Los Angeles Rate | 2018 Los Angeles Rate | 2018 Orange County Rate |
|---|---|---|---|
| Mr. Stormer | $665.00 | $701.39 | $617.22 |
| Ms. Pánuco/Mr. Dunn | $665.00 | $701.39 | $617.22 |
| Mr. Olney | No data | ----- | ----- |

This is the **Fourth Benchmark** for the Court.

**Benchmark Five**

24.    In *Lehr v. City of Sacramento*, Case No. 2:07-CV-01565 MCE (GGH) (E.D. Cal. March 22, 2013),[12] the court did a study of attorney fee rates for top level civil rights attorneys in Sacramento County, and found the blended rate to be $400.00 per hour. Similarly, in 2016, the court in *Mountjoy v. Bank of America*, 245 Cal. App. 4th 266 (2016), found the market rate for civil rights cases in Sacramento county was $450.00/hour and $350.00 per hour for partners and associates, respectively.

---

[12]   This case is cited not as persuasive or mandatory case authority, but simply for its non-legal findings as to the market for attorney's fees.

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

Normalized to 2018 rates, the *Lehr* rates become $431.02. The *Mountjoy* rates would become $484.90 and $377.14, respectively, for partners and associates. Marrying up the two cases gives market rates of **$457.96 for partners and $404.08 for associates**. My own experience, as well as the studies mentioned heretofore indicate an essential equality between the market fee rates in Sacramento and Orange Counties.

This is the court's **Fifth**, and last, **Benchmark**.

### Recommended Rates

25.     From averaging the applicable five benchmarks above, one obtains the following fee rate estimates for counsel, rounded to the nearest dollar, which I recommend as the reasonable market rates to use in this case:

| | Benchmark 1 | Benchmark 2 | Benchmark 3 | Benchmark 4 | Benchmark 5 | Average | Recommended Rate |
|---|---|---|---|---|---|---|---|
| Mr. Steering | ----- | ----- | ----- | ----- | ----- | **-----** | $350.00 |
| Mr. Stormer | $574.95 | $327.02 | $544.34 | $617.22 | $457.96 | **$504.30** | **$500.00** |
| Ms. Pánuco | $422.04 | $310.71 | $382.92 | $617.22 | $457.96 | **$438.17** | **$450.00** |
| Mr. Dunn | $422.04 | $310.71 | $477.73 | 617.22 | $457.96 | **$457.13** | **$450.00** |
| Mr. Olney | $317.90 | $225.06 | $312.43 | ----- | $404.08 | **$314.87** | **$325.00** |

It is interesting to note that these computations place Mr. Stormer exactly where the other highly experienced trial counsel in the case places his own "normal" fee for civil rights cases; i.e., $500.00/hour.

### *The Reasonableness of the Hours Billed.*

26.     There are several areas in which I can, and do, render opinions in this case. I will review them generally at this point, and will detail those opinions later as to each offending biller, individually. In reviewing the bills in this case, I recommend reduction of various categories of billing, either proportionately or totally, for reasons that will be stated later. There were few problems with the form of the bills, but those problems did exist. For example, block billing was liberally used. There were also miscellaneous instances where there was a duplication of billing, an attorney charging

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

for clerical work, *etc*. Those areas will also be isolated and discussed below.

27.   **Block Billing.** Block billing is generally and consistently discouraged, since it interferes with the client's ability (and ultimately the court's ability) to determine how much time each task took, and whether it was reasonable.

The California State Bar has taken a hard position on such a technique. In its publication, "Analysis of Potential Bill Padding and other Billing Issues" (March 25, 2016), at page 9, the Bar defined block billing as the improper practice of lumping several tasks together in one billing entry, thereby obfuscating the time spent on any one task (*e.g.*, "review client's email, retrieve file, call with DR re same, and prepare/send reply."[13] The State Bar opined that this practice may well violate ethical duties under Business & Professions Code section 6148(b), since it tends to cause "camouflaging [of] noncompensatory tasks" and make it impossible for a client or court to evaluate the reasonableness of amount of time spent on any given item of work. Accordingly, the Bar stated that the practice "should be viewed with suspicion." In conclusion, the Bar reiterated it opinion, first stated in 2003 in its publication "Detecting Attorney Bill Padding," that a 10%-30% across the board reduction in time which has been block billed is appropriate. The Ninth Circuit apparently agrees, since, for similar reasons, it validated a 20% across the board reduction in block billed fees. *Welch v. Metropolitan Life Insurance Company*, 480 F.3d 942, 945 (9th Cir. 2007).

In this case, I recommend a 15% across the board reduction of block billed items, as follows.

///

///

///

///

---

[13]   Probably 25% of the billing entries in this case are like this. Others are worse, where, for example, 12 or more different tasks are lumped into one entry. This does **not** count proper entries where counsel placed the precise time spent on each task in parentheses next to the individual item.

46

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

| Biller | Hours Block Billed | % of Total | Amount Deducted @ 15% |
|---|---|---|---|
| Steering | 32.7 | 9.6% | 4.9 |
| Stormer | --- | --- | --- |
| Dunn | --- | --- | --- |
| Pánuco | 168.2 | 22% | 25.2 |
| Olney | 87.3 | 14 | 13.1 |

28.    **Overstaffing.** There were two specific instances of overstaffing; *i.e.*, the mediation and the trial. In the mediation, three attorneys attended for Plaintiff. Certainly, it is understood that in a major case the primary counsel should attend and, if appropriate, the attorney other than he who is most familiar with the facts of the case. In this case, it was acceptable for Mr. Stormer to be accompanied by **either** Ms. Pánuco **or** Mr. Olney, but not both. There is no reason offered or understandable for the third attorney. Therefore, I would **deduct Mr. Olney's 8.1 hours** billed for this event.

At trial, Mr. Stormer was, by far, the most active counsel for Plaintiff and carried the load for the overwhelming majority of the time. Ms. Pánuco spent 55 minutes delivering the opening statement, and Mr. Olney spent 3-5 on the two witnesses he examined. Mr. Stormer did all the rest, billing 112.2 hours for the trial. However, inexplicably, not only did both Mr. Olney and Ms. Pánuco attend the entire trial, usually doing nothing but spectating, but they spent more time than Mr. Stormer doing it! Ms. Pánuco billed 148.35 hours at trial (32% more time than Mr. Stormer), and Mr. Olney spent 122.1 hours in trial (9% more time than Mr. Stormer). This is inexcusable padding**. I recommend allowing a total of 112.2 hours for the combined time of Ms. Pánuco and Ms. Olney; *i.e.*, reduce Ms. Pánuco's time billed by 92.25 hours, and Mr. Olney's by 66.0 hours.**

29.    **Time Spent Correcting Plaintiff's Counsel's Own Negligence.** As stated earlier, Mr. Steering is a fine attorney, usually, but no one is perfect. In this case, he committed two egregiously negligent acts. First, according to the billing records, he failed to timely file plaintiffs' Appellant's Opening Brief. Then, he

47

charged for three hours of his time spent fixing his own error.

Secondly, and more significantly, he failed to conduct necessary discovery, failed to designate expert witnesses, and failed to depose Defendants' expert witnesses. This led to a replacement of his firm as counsel of record, ultimately with Mr. Stormer's. In another act of hubris, Plaintiff's counsel seeks to blame defense counsel for this error and charge the defendants 83.7 hours of work correcting it once the case arrived at the Stormer firm.

There is no doubt that Plaintiff was victimized by this negligence, but it was not Defendants' doing – it was the doing of Plaintiff's own counsel, who legally acts for Plaintiff, herself. If the damage for this remains where it belongs, on Plaintiff's shoulders, then she has a remedy against the perpetrator; however, if it is improperly shifted to Defendants, they have no recourse. This Court is not and should not be in the business of substitution of victimization, especially not from the guilty to the innocent. Instead, this Court is and should be in the business of dispensing justice, which in this instance requires the cost of correcting Plaintiff's counsel's errors where it belongs -- on Plaintiff and her counsel

**I recommend reducing the fee request by 3 hours of Mr. Steering's time, 66 hours of Mr. Olney's time, 2 hours of Mr. Stormer's time, 26.3 hours of Ms. Pánuco's time, and 65.2 hours of Mr. Olney's time**.

30.     **Excessive Time.** Plaintiffs lost the entire issue of causation of death at trial. Mr. Olney billed approximately 32.9 hours preparing for Dr. Hiserodt's deposition (this does not count working with the witness before his deposition was scheduled), which took only two+ hours to take.[14] That is excessive to the extreme. I believe seven hours of deposition preparation time is more than sufficient, so **I**

---

[14]   There is also the question of the deduction of the entire of the time to prepare and examine this witness, before and during trial. This is because of the general rule that one only collects attorney's fees to the extent one was the prevailing party. However, plaintiffs lost this critical issue. This issue will be treated separately in the discussion of a "*Hensley*" deduction, or a fractional/negative multiplier, *infra*.

1390614.1

WOODRUFF, SPRADLIN
& SMART
ATTORNEYS AT LAW
COSTA MESA

**recommend deduction of 25.9 of the preparation hours from Mr. Olney.**

   31.   **Miscellaneous Deductions**.

     a.  **Mr. Stormer.** Mr. Stormer occasionally billed for performing clerical tasks. That is improper, since it should be performed by clerical staff, which is part of his overhead supposedly included within his hourly rates to clients. As two examples: On May 25, 2018, he downloaded a file, obtained a form, and updated a file, spending 2.9 hours. On May 29, he performed the clerical tasks of "setting up calls" he later participated in and prepared for (another 2.9 hours). **I recommend a 5.8-hour deduction from his time.**

     b.  **Ms. Pánuco.** Ms. Pánuco also billed for secretarial or other clerical tasks. There was also evidence of double billing and billing for outrageous matters. She billed for "transcribing tapes" (3.7 hours), filing (.35 hours), and "scheduling" (0.3 hours) in August and September of 2018. In October, she billed for sending things to her secretary (0.3 hours). In November, she billed 0.8 hours for gathering and preparing exhibits and "overseeing" filing. In December, she again oversaw filing (1.6 hours), and checked on the status of subpoenas with non-staff on three occasions totaling (7.5 hours). She also billed for her travel time to and from court twice on January 8 (3.9 hours each time). Unbelievably, she actually billed 0.5 hours for conferring with herself on October 5. On January 7, 2019, she billed 2.0 hours for preparing filings. She billed 3.18 hours during trial for making sure the audio visual worked, which is a paralegal's or vendor's job. Post-trial, she billed for time spent marketing her own firm when she spoke to reporters and wrote her blog following trial (3.0 hours). **In total, I recommend deducting 27.1 hours from her time.**

     c.  **Mr. Olney**. Mr. Olney billed for several inappropriate matters. In a

49

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

questionable activity, Mr. Olney billed for writing and editing his own expert's report on October 17 and 19 (4.0 hours). He billed 4.2 hours for preparing video files, a vendor's or paralegal's job. He also bills for 1.4 hours spent promoting himself and his firm to reporters from CBS following trial. **In summary, I recommend deducting 9.6 hours from his time.**

33.    The following chart summarizes my opinions regarding reasonableness of the hours billed for which compensation is sought herein.

| Billing Entity | Hours Billed[15] | Hours to Deduct | Net Hours |
|---|---|---|---|
| Mr. Steering | 339.3 | 7.9 | 331.4 |
| Mr. Dunn | 7.0 | ----- | 7.0 |
| Mr. Stormer | 364.85 + 30.0 estimated hours for this motion = 394.85 | 7.8 | 357.05 |
| Ms. Pánuco | 773.93 | 170.85 | 603.08 |
| Mr. Olney | 629.2 | 162.0 | 467.2 |

*The Issue of a Positive, Negative, or Fractional Multiplier*

34.    Finally, I will consider the multiplier, if any, to apply hereto. Plaintiff, wisely and correctly, does not ask for a positive enhancement multiplier. As for a negative multiplier, that is a misnomer, since a negative multiplier would result in an actual award of fees to the non-prevailing party. Instead, the more meaningful term would be "fractional multiplier." There is ample reason to apply a fractional multiplier in this case.

///

---

[15]   The number of hours for Mr. Stormer's firm is taken from its actual billings, Exhibit C to the Motion, page 151.

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

50

1390614.1

Plaintiff is correct that a prevailing party shouldn't be penalized for every minor loss in litigation. However, in this case, the overall outcome of the case cries out for such a fractional multiplier if any case ever could. Here, as in any other case, Plaintiff is the "prevailing" party, technically, or the motion could not be made at all. Therefore, the Court must necessarily look to the overall success of each side in the case. If it were even close, perhaps a negative multiplier would not be appropriate. But that is not the case.

In this case, Defendants won 10 of the 11 causes of action against them by the decedent's estate. This included victory on the 14th Amendment claims, state civil rights claims, claims concerning causing death without due process, and the "*Monell*" claims, as well as all three of the state tort claims. They won the issue brought up by Dr. Hiserodt and Plaintiff regarding cause of death. They won punitive damages issues.

Therefore, they were actually the prevailing party, as a matter of law, as to Plaintiff in her individual capacity, and are liable to her for no attorney's fees whatsoever. Plaintiff has not attempted to separate out the fees incurred for her unsuccessful prosecution of Defendants from those stemming from the Estate's case. That, in and of itself, is fatal to any recovery herein.

For all of these reasons, half the fees should be disallowed as improper due to the defense prevailing against Plaintiff in her individual capacity, whose claims were different from the claims in brought in her representative capacity, including having different elements and damages. At least half of what is left was a successful result for Defendants.

**Therefore, I recommend a 75% reduction in whatever is found to be otherwise reasonable attorney's fees sought in this case.**

///

///

///

51

1390614.1

1

*Summary*

2

35.   Given the recommendations on billing rates and hours billed, the

3

following chart reflects my ultimate opinions on the reasonable amount of

4

attorneys/paralegal fees to award in this matter:

5
6
7

| Billing Entity | Recommended Billing Rate | Net Reasonable Hours Billed | Gross Reasonable Fees | Net Reasonable Fees after Fractional Multiplier |
|---|---|---|---|---|
| Mr. Steering | $350.00 | 331.4 | $115,990.00 | $28,997.50 |
| Mr. Stormer | $500.00 | 357.05 | $178,525.00 | $44,631.25 |
| Mr. Dunn | $450.00 | 7.0 | $3,150.00 | $787.50 |
| Ms. Pánuco | $450.00 | 603.08 | $271,386.00 | $67,846.50 |
| Mr. Olney | $325.00 | 467.2 | $151,840.00 | $37,960.00 |
|  |  |  |  |  |
| **Total Net Fees Recommended** |  | **1,765.73** | **$720,891.00** | **$180,222.75** |

8
9
10
11
12
13
14

I declare under penalty of perjury that the foregoing is true and correct.

15

Executed this 4th day of March 2019, in Costa Mesa, California.

16
17
18

/s/ *Robert L. Kaufman*

ROBERT L. KAUFMAN

19
20
21
22
23
24
25
26
27
28

1390614.1

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

## DECLARATION OF JEANNE L. TOLLISON

I, JEANNE L. TOLLISON, hereby declare:

1.      I am an attorney, duly licensed to practice law before all the Courts of the State of California as well as before this Court. I am a director at Woodruff, Spradlin & Smart, A Professional Corporation, counsel of record for Defendants COUNTY OF ORANGE and MICHAEL HIGGINS.

2.      Contrary to the statements contained in Ms. Pánuco's declaration, throughout this litigation this office has made concerted efforts to cooperate with Plaintiff's third attorneys of record Hadsell Stormer & Renick while at the same time mounting a competent defense for the County and Michael Higgins. For example, between July 9, 2018 and August 9, 2018, I (along with Daniel K. Spradlin, also a Director with Woodruff, Spradlin & Smart) met and conferred with Ms. Pánuco regarding her request to re-open discovery. As a result of these discussions, we agreed that (1) both Defendants and Plaintiff have the right to depose any expert witness that the other party intends to call as a witness at the time of trial and (2) the County will produce the documents Mr. Cope reviewed and relied upon to form his opinion. I did not agree that Plaintiff may: (1) reopen discovery; (2) designate additional expert witnesses to call at trial; and (3) further depose Deputy Higgins.  As I explained to Ms. Pánuco, during the meet-and-confer process, the discovery cut-off date passed more than three years ago and that Plaintiff's new counsel could not reopen discovery merely because they possess different strategies and tactics than her original counsel, Mr. Steering. I also refused to stipulate to allow Plaintiff to designate yet a third medical expert (having already identified Dr. Joseph Cohen and Dr. Howard Oliver in her expert disclosures as witnesses regarding Zion's cause of death).

3.      After this Court allowed Plaintiff to designate a new medical expert regarding cause of death issues, I worked diligently in cooperating with Plaintiff's counsel in producing the remaining brain tissue, setting the date and time for inspecting the brain tissue, and extending the time for Dr. Hiserodt to provide his

1390614.1

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

report regarding that inspection.

    a. My first notice that Plaintiff's new medical expert needed to review brain tissue slides in the County's possession came on Friday, September 21, 2018, at approximately 6:44 p.m.

    b. Upon returning to the office on the next working day -- Monday, September 24, 2018 – I contacted my client about locating the slides.

    c. Plaintiff's counsel then emailed a request for production on September 26, 2018, to which Defendants objected on September 28, 2018.

    d. On October 2, 2018, in the morning, I advised Ms. Pánuco that the County had located the tissue samples and was in the process of preparing the slides and that they would be available for inspection on October 10, 2018.

    e. The parties entered into a *joint stipulation* regarding production and inspection of the brain tissue, with Magistrate Judge John Early signing the agreed upon order on October 2, 2018.

    f. The inspection occurred on October 10, 2018. I advised Plaintiff's counsel and her expert that I would have the coroner cut some of the sample brain tissue and make it available to Dr. Hiserodt the next day. This was actually done.

    g. Then, in an effort to ameliorate any negative impact to Plaintiff due to this one-day delay, I also informed Plaintiff's counsel, Mr. Olney, that Defendants would stipulate to allowing Dr. Hiserodt additional time to complete his report. Another joint stipulation was submitted and Plaintiff was allowed additional time for Dr. Hiserodt to complete his report.

4. Following these events – and following the second, limited session of Michael Higgins's deposition, Plaintiff's counsel brought a motion for evidentiary sanctions. Because this motion contained many misrepresentations, and because Defendants had in good faith cooperated in the discovery requests, this office

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

54

1390614.1

vigorously opposed this motion. Following the filing of supporting papers by both sides, and the conducting of an evidentiary hearing, this Court stated that, it did not believe the circumstances warranted an evidentiary sanction. Copies of pages 182 and 183 from the January 8, 2019 Reporter's Transcript are attached as Exhibit B. Also, this Court denied Plaintiff's motion for evidentiary sanctions regarding Higgins's deposition. (See Plaintiff's Exhibit 6, Dkt. 305-1, p. 57 of 235.)

5.     This case was always presented by Plaintiff's counsel as one seeking damages for Zion's death. For example, in her opening statement Ms. Pánuco stated that Plaintiff would be asking the jury "to hold the defendant, Michael Higgins, responsible for killing Connor Zion and for a verdict on behalf of the plaintiff against the deputy who killed Connor" and also asked the jury to compensate Plaintiff for the loss of Connor Zion. Copy of page 35 from the January 9, 2019 Reporter's Transcript is attached as Exhibit C.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of March 2019, in Costa Mesa, California.


*/s/ Jeanne L. Tollison*_____
JEANNE L. TOLLISON

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1390614.1

## **PROOF OF SERVICE**

## **STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am over the age of 18 and not a party to the within action; I am employed by WOODRUFF, SPRADLIN & SMART in the County of Orange at 555 Anton Boulevard, Suite 1200, Costa Mesa, CA 92626-7670.

On March 4, 2019, I served the foregoing document(s) described as **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND NON-TAXABLE COSTS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ROBERT L. KAUFMAN AND JEANNE L. TOLLISON**

☐ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list;

☐ **(BY MAIL)** I placed said envelope(s) for collection and mailing, following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for deposit in the United States Postal Service. I am readily familiar with the practice of WOODRUFF, SPRADLIN & SMART for collection and processing correspondence for mailing with the United States Postal Service, and said envelope(s) will be deposited with the United States Postal Service on said date in the ordinary course of business.

☒ **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

☐ **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for collection and delivery to a courier authorized by _____ to receive said documents, with delivery fees provided for. I am readily familiar with the practices of WOODRUFF, SPRADLIN & SMART for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by _____ on said date in the ordinary course of business.

☐ **(BY FACSIMILE)** I caused the above-referenced document to be transmitted to the interested parties via facsimile transmission to the fax number(s) as stated on the attached service list.

☒ (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on March 4, 2019, at Costa Mesa, California.

s/ *Laura F. Perez*
LAURA F. PEREZ

1390614.1

1

## KIMBERLY ZION v. COUNTY OF ORANGE, et al.

2

### USDC, CENTRAL DISTRICT OF CALIFORNIA
### CASE NO:  8:14-cv-01134-JVS-RNB

3

4

### ASSIGNED TO JUDGE JAMES V. SELNA
### REFERRED TO MAGISTRATE JUDGE JOHN D. EARLY

5

### SERVICE LIST

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dan Stormer, Esq.
Cindy Panuco
Brian Olney, Esq.
HADSELL STORMER & RENICK LLP
128 North Fair Oaks Ave.
Pasadena, CA  91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Email:  dstormer@hadsellstormer.com
        cpanuco@hadsellstormer.com
        bolnev@hadsellstormer.com

Attorneys for Plaintiff
**KIMBERLY J. ZION, individually and as successor in interest to CONNOR ZION**

8/20/18

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1390614.1